Haviv SCHIEBER, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 74–1866.

United States Court of Appeals,
District of Columbia Circuit.

May 19, 1975.

See also 9 Cir., 347 F.2d 353; 2 Cir.,
461 F.2d 1078.

Bruce J. Terris, Zona F. Hostetler and Nathalie V. Black, Washington, D. C., were on the pleadings for respondent.

John L. Murphy, Chief, Crim. Div., Dept. of Justice, and Richard I. Chaifetz, Atty., Dept. of Justice, were on the pleadings for respondent.

Before McGOWAN and ROBINSON, Circuit Judges.

PER CURIAM:

Haviv Schieber has filed a petition for review of an order of the Board of Immigration Appeals denying his motion to reopen proceedings seeking his deportation. By statute, the petition has the automatic effect of staying deportation, unless otherwise directed by the court, pending resolution of the case on the merits.[1] The Immigration and Naturalization Service (INS) has moved for vacation of the statutory stay to enable Schieber's deportation forthwith. For the reasons hereinafter articulated, we grant the motion to vacate and, finding no nonfrivolous question presented for consideration on the merits, we dismiss the petition for review *sua sponte.*

I

Schieber was born in 1913 in Kormarno, Poland, now in the Soviet Union. He fled anti-semitism in 1932 and emigrated to Palestine, and during the Holocaust he risked life and limb to help other Jews escape the Nazis and resettle in Palestine. A builder by trade, Schieber increasingly involved himself in politics in the new state of Israel; a virulent anti-Communist and anti-Socialist, he sparred frequently with the ruling Mapai Party of David Ben-Gurion. Ultimately, he went to the final step of organizing the Democratic Party of Israel as an anti-Communist party which among other things advocated religious freedom and equal status in Israel for non-Jews. Schieber was arrested eighteen times during the years 1947–58, he says for political reasons. The most serious of his four convictions were two in 1954 for obtaining money under false pretenses.

In 1959, Schieber, a founder of the AntiCommunist League of Israel, went as the Israeli delegate to the International Conference of the AntiCommunist League, held that year in Guatemala. After the conference, on March 3, 1959, he entered the United States at Miami, and since he was a nonimmigrant visitor for pleasure,[2] he was required to depart by February 1, 1960. He has remained in the United States by a combination of litigation in the courts and lobbying in Congress and through the press. The story must be recounted because it bears directly on the treatment this court should accord his current effort to avoid deportation.

After the expiration of his visa, Schieber settled in New York and worked as a construction foreman. The INS found him there and at a deportation hearing before a Special Inquiry Officer on March 15, 1961, he conceded deportability.[3] A final deportation order was entered and Schieber did not appeal. He did, however, petition the Special Inquiry Officer and the Northeast Regional Commissioner to reopen the deportation proceeding[4] to permit him to intro-

---

1. See note 32, *infra.*

2. See 8 U.S.C. § 1101(a)(15)(B) (1970).

3. He was deportable under § 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1970), as an alien who had remained in the United States for a period longer than that specified in his visa. This remains the sole ground for his deportation.

4. Motions to reconsider are governed by 8 C.F.R. § 3.8 (1974), which provides in part:

   Motions to reopen shall state the new facts to be proved at the reopened hearing and shall be supported by affidavits or other evidentiary material. Motions to reconsider shall state the reasons upon which the motion is based and shall be supported by such precedent decisions as are pertinent.

**46**

duce evidence allegedly showing that if deported to Israel he would be subject to political persecution, and to argue that on that account the Attorney General should withhold deportation and grant him political asylum.[5] Hearings on the petition were held in April and August, 1961, culminating in a denial of relief. A petition for review was filed in the Second Circuit but was ultimately dismissed by mutual agreement when, Schieber having married an American citizen, the INS granted him a new hearing, this time on a petition for an adjustment of his status in light of his marriage.[6]

■ Hearings on that petition took better than two years [7] and in the meantime Schieber's wife obtained a divorce. Since he was no longer the immediate relative of an American citizen, and thus automatically eligible for a visa regardless of the numerical limitations imposed,[8] the success of his application for adjustment of status turned on the availability of an immigrant visa. The

The Board's policy on granting such motions is governed by 8 C.F.R. § 3.2 (1974), which provides in part:

> Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing; nor shall any motion to reopen for the purpose of affording the alien an opportunity to apply for any form of discretionary relief be granted if it appears that the alien's right to apply for such relief was fully explained to him and an opportunity to apply therefor was afforded him at the former hearing unless the relief is sought on the basis of circumstances which have arisen subsequent to the hearing.

5. Section 243(h) of the Act, 8 U.S.C. § 1253(h) (1970), provides:

> The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

On several occasions during the course of this protracted matter, the Board of Immigration Appeals has referred Schieber's request for asylum to the Office of Refugee and Migration Affairs of the State Department, which has uniformly concluded that even after his Yom Kippur War broadcasts—see note 24, infra, and accompanying text—he has no reason to fear political persecution in Israel.

6. Section 245(a) of the Act, 8 U.S.C. § 1255(a) (1970), provides:

> The status of an alien . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available

to him at the time his application is approved.

7. In the earlier § 243(h) political asylum hearing, Schieber had freely admitted his arrest record, and had sought to demonstrate thereby a pattern of systematic political persecution at the hands of the Israeli police. The § 245(a) hearing commenced upon his marriage took so long because the Board wanted to probe this criminal background to determine whether it rendered Schieber excludable under § 212(a)(9), 18 U.S.C. § 1182(a)(9) (1970), notwithstanding his marriage to an American citizen. Under § 212(a)(9), if the crimes of which Schieber had been convicted involved moral turpitude, he was ineligible to receive a visa. If he was ineligible to receive a visa, then he could not comply with the second test for an adjustment of status under § 245(a), regardless of his marriage. Ultimately, the Board did not rule on the § 212(a)(9) issue in 1964, because, given the collapse of the marriage, in May of 1963, Schieber no longer qualified for the 8 U.S.C. § 1151(b) exemption from quota for immediate relatives of American citizens. As a nonpreference immigrant under 8 U.S.C. § 1153, Schieber would then be subject to the quota for his country of birth; and when it was ascertained that Poland was oversubscribed, it became evident that, without regard to whether he could meet the second test of § 245(a) in light of past criminality, he could not meet the third test of § 245(a)—that an immigrant visa be immediately available to him. So it was that, on May 18, 1964, the Board denied his § 245(a) adjustment-of-status petition.

8. 8 U.S.C. § 1151(b) (1970), provides that immediate relatives of United States citizens "who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations in this chapter," i. e., the quotas outlined in 8 U.S.C. § 1153 (1970). Even had Schieber's marriage not failed it is uncertain that he would have been given an adjusted status in light of his prior criminal record 8 U.S.C. § 1182(a)(9) (1970) and notes 6 and 7, supra.

Board denied the visa because the non-preference quota for Polish immigrants was oversubscribed.[9]   Schieber, then a resident of Los Angeles,[10] petitioned· the Ninth Circuit for review of the Board's denial and its refusal to reopen the political persecution issue.   On June 14, 1965, the Ninth Circuit affirmed the Board on both counts.[11]

Following this setback, Schieber and a growing number of allies[12] turned their attention to Congress.   The next four years were consumed in an effort, in three successive Congresses, to secure

9. The quota system is established in 8 U.S.C. § 1152 (1970), which provides that "the total number of immigrant visas and the number of conditional entries made available to natives of any single foreign state  .   .   .   shall not exceed 20,000 in any fiscal year."   Section 1152(b) (1970) notes that the foreign state to which a putative immigrant is chargeable "shall be determined by birth within such foreign state"—in Schieber's case, Poland.   8 U.S.C. § 1153(a) (1970) institutes a preference system for allocating these visas among various categories of immigrants: first preference, not to exceed 20% of a country's allotment, to unmarried children of United States citizens; second preference, not in conjunction with first preference visas to exceed 40% of a country's allotment, to spouses and children of an alien lawfully admitted for permanent residence; third preference, not to exceed 10% of a country's allotment, to members of the professions, scientists and artists;  fourth preference not in conjunction with the first three preference visa categories to exceed 60% of a country's allotment, to married children of United States citizens; fifth preference, not in conjunction with the first four preference visa categories to exceed 84% of a country's allotment, to brothers and sisters of United States citizens; sixth preference, not to exceed 10% of a country's allotment, to "qualified immigrants who are capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States" as determined by the Secretary of Labor pursuant to 8 U.S.C. § 1182(a)(14) (1970).   The remaining 6% of a country's quota may be used for the issuance of conditional entry visas to refugees from communist countries or victims of natural catastrophes.   Any visas left over in a calendar year "shall be made available to other qualified immigrants strictly in the chronological order in which they qualify," and only if the Secretary of Labor certifies that such entry will not deleteriously affect the United States labor force.   8 U.S.C. § 1153(a)(8) (1970).   After the demise of his marriage, Schieber found himself as a nonpreference nonrefugee, eligible for admission only if the yearly quota from his native land of Poland was not otherwise claimed by preference categories.   The Polish quota was oversubscribed.

10. As stated in text, Schieber lived in New York City from March, 1959, until November, 1964, when he moved to Los Angeles.   In August, 1965, he moved to Miami, where he stayed until his return to New York in May, 1966.   He stayed in New York until May, 1974, when he moved to Washington in a last ditch effort to locate a country to which he could voluntarily relocate.

11. Schieber v. INS, 347 F.2d 353 (9th Cir. 1965).   Judge Hamlin, writing for a unanimous panel, held that "the record shows that petitioner is deportable."   *Id.* at 354.   The court also held that there was substantial evidence to support the refusal of the Attorney General to withhold deportation under § 243(h).   *Id.* See note 4, *supra.*

The judicial review provision of the Act, 8 U.S.C. § 1105a(a)(2) (1970), provides that

the venue of any petition for review under this section shall be in the judicial circuit in which the administrative proceedings before a special inquiry officer were conducted in whole or in part, or in the judicial circuit wherein is the residence, as defined in this chapter, of the petitioner, *but not in more than one circuit.*

(Emphasis supplied).   See also 8 U.S.C. § 1105a(c) (1970) (no order once upheld can be reattacked absent compelling new ground).

This language, evincing congressional intent to avoid multiple appeals on the same issues in the same deportation proceeding, as well as general principles of *res judicata,* should lead any court to be wary of entertaining anew claims adjudicated by a sister circuit.   Since the Ninth Circuit rejected Schieber's § 243(h) claim that the Attorney General abused his discretion by refusing to withhold deportation on grounds of political persecution, he should be foreclosed from raising it again in the instant petition for review unless cogent and compelling *new* evidence exists on this score.   Our study of the arguments he advances convinces us that he has failed to introduce compelling evidence that the situation has changed substantially since the Ninth Circuit's decision in 1965.   On this ground alone the instant petition, insofar as it is based on the Board's failure to reopen the proceedings to take evidence on the § 243(h) issue, could hardly survive.

12. By 1965, Schieber had been living and working in this country for six years.   His allies included business associates, clients and bankers who vouched for his integrity and industriousness.

enactment of a private bill foreclosing Schieber's deportation. Since, by administrative practice, a deportation order is stayed while private bills for relief of an alien are pending in Congress, the lobbying activity, while ultimately unsuccessful, did allow Schieber to remain in this country four more years. The defeat of his fourth private bill on October 27, 1969, however, signalled the end of the first congressional phase of his fight against deportation,[13] and ushered in a new round of agency and court litigation which has culminated in the petition for review *sub judice.*

■ Later in 1969, Schieber petitioned the Board to reopen his proceeding to permit him to apply to the Attorney General for a suspension of deportation.[14] The Board denied the petition,[15] and also denied an amended petition which reasserted the political persecution grounds rejected by the Ninth Circuit; and on appeal, the Second affirmed.[16]

13. See text *infra* at note 23.

14. Section 244(a) of the Act, 8 U.S.C. § 1254(a) (1970), provides that the Attorney General may

in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and— (1) *is deportable* under any law of the United States except the provisions specified in paragraph (2) of this subsection; *has been physically present* in the United States for a continuous period of not less than *seven years* immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, *in the opinion of the Attorney General*, result in *extreme hardship* to the alien . . . .
(Emphasis supplied).

15. The Board acted on January 9, 1970. In denying the petition to reopen, the Board noted that a warrant for Schieber's deportation, issued on November 19, 1964, was still outstanding. The Board further noted that Schieber had made no showing of extreme hardship which would result from deportation, and after independent review of the record the Board concluded that "extreme hardship would not result." This was the primary ground given by the Board for denial of relief. Perhaps as an afterthought, the Board noted that Schieber had been able to meet the seven-year physical-presence requirement of § 244(a)(1) by "taking advantage of every administrative and other remedy available to him no matter how meritorious his claims were"; and this factor inclined the Board to deny relief unless there were "*particularly strong equities*" the other way. *See* Matter of Lee, 11 I. & N. Dec. 649 (1969). Since the Board found no particularly strong equities here, relief would have been denied even if Schieber had demonstrated the requisite quantum of hardship from deportation.

Schieber, in his brief on the merits of the instant petition for review and in his opposition to the INS motion to vacate the stay of deportation, relies heavily on the decision of the Ninth Circuit in Asimakopoulos v. INS, 445 F.2d 1362 (9th Cir. 1971), in which the court held that use of the *Lee* principle as the *sole* ground for denial of § 244(a)(1) relief to an alien otherwise qualified was an impermissible failure to exercise statutory discretion. *Id.* at 1365. Schieber argues that this decision requires the Board to reconsider its 1970 denial of § 244(a) relief, which, he says, was based solely on the now discredited *Lee* rule. This argument is faulty for two reasons. First, as demonstrated above, the 1970 denial was based on the absence of hardship, a factor not present in *Asimakopoulos.* Second, and more important, the Board's 1970 denial of § 244(a) relief was affirmed on appeal by the Second Circuit. See note 16, *infra.* Even if there is some conflict between that affirmance and *Asimakopoulos*, clearly the Second Circuit was free to carve its own path, and was not bound by the decisions of a sister court. Schieber's attempts to avoid the obviously binding effect of the Second Circuit's 1970 decision affirming the Board's decision not to reopen the deportation proceedings to provide § 244(a) relief are not persuasive. Particularly, we are not persuaded of the necessity to decide anew the propriety of the *Lee* rule in light of the Second Circuit's affirmance.

16. Schieber v. INS, 427 F.2d 1019 (2d Cir. 1970). On the § 243(h) issue, the court noted that the same issue had been adversely decided by the Ninth Circuit, and that "petitioner has presented no additional evidence concerning alleged political persecution sufficient to require a reopening on that issue. *Id.* at 1020. On the § 244(a)(1) ground, the court held that "[t]he Board did not abuse its discretion by refusing to act favorably on this claim." *Id.* For the reasons advanced in note 11, *supra*, this decision by the Second Circuit should bar Schieber, absent compelling new evidence on the issue, from relitigating the denial of § 244(a)(1) relief in the instant petition for review. In our view, he has not met this bur-

Schieber then adopted a fresh approach: aided by his special skills in the construction trades, he applied for and received from the Secretary of Labor [17] a certificate by which he sought to transform himself from a nonpreference to a sixth preference alien—one more likely to receive an immigrant visa.[18] To this end, he petitioned the Board to reopen the deportation proceeding to enable him to apply in light of the certification for an adjustment of status.[19] On September 23, 1971, the motion to reopen was denied on the ground that Schieber was not eligible to receive an immigrant visa because he had previously been convicted of crimes of moral turpitude.[20]

Schieber then filed a motion to reconsider, seeking an opportunity to demonstrate that the offenses of which he had been convicted did not involve any element of moral turpitude. The Board denied the motion on October 12, 1971, and a petition for review was summarily dismissed by the Second Circuit—from the bench—as frivolous.[21] Still another motion to reopen the proceeding for an undertaking to show the absence of moral turpitude resulted in a quick administrative denial, and a terse but sharply worded affirmance by the Second Circuit which spelled the end of Schieber's welcome in that court.[22]

den and on this ground alone the denial of § 244(a)(1) relief by the Board should be affirmed.

**17.** Pursuant to 8 U.S.C. § 1153(a)(8). See note 9, *supra.*

**18.** See note 9, *supra.*

**19.** See note 6, *supra.*

**20.** See notes 6, 7, *supra.* Section 212(a) of the Act, 8 U.S.C. § 1182(a) (1970), catalogs the categories of excludable aliens, of which the ninth is "[a]liens who have been convicted of a crime involving moral turpitude (other than a purely political offense) . . . ." In rejecting Schieber's petition, the Board dismissed his contention that his Israeli convictions, particularly the two for obtaining money by false pretenses, were political offenses.

From a translation of a certified copy of the judgment in those cases, contained in the record before us, we learn that apparently in the early 1950's in Israel, political parties built up their influence by providing quasi-governmental services such as housing to people at cost, thereby winning adherents. Schieber was convicted of two counts of false pretenses stemming from his solicitation of tenants for a proposed housing project for which he had not and could not obtain a construction permit. His defense was that he did it for the good of his fledgling Democratic Party of Israel, and that when caught he returned the proceeds. Unmoved, the judge noted that Schieber had taken the risk that he would not be detected, and that regardless of motivation he had bilked those who, in desperate need of shelter, had paid over their last savings. He was sentenced to three month consecutive sentences at hard labor for each offense.

Thus the Board's conclusion that these convictions rendered Schieber an excludable alien under § 212(a)(9), so as to negate his effort to obtain an adjustment of status under § 245(a), is supported by sufficient evidence in the record to preclude invalidation. See 8 U.S.C. § 1105a(a)(4) (1970) (petition for review of deportation order "shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive").

**21.** Schieber v. INS, No. 71–1962 (unpublished order Nov. 1, 1971), cited in Schieber v. INS, 461 F.2d 1078, 1079 (2d Cir. 1972).

**22.** Schieber v. INS, *supra* note 21. The unanimous per curiam opinion began:

This is the latest, and we trust the last, effort by this petitioner, a citizen of Israel, to avoid deportation pursuant to a valid deportation order requiring him to depart the United States more than eleven years ago.

*Id.* at 1079. The court concluded that

[o]ur independent examination of the record before us satisfies us that the Board did not abuse its discretion and that it applied the proper criteria in denying petitioner's latest motion to reopen the deportation proceedings.

*Id.*

In a footnote, the court articulated its impatience with Schieber's tactics:

From that date (March 22, 1961) until the present, by filing no less than eight motions with the Board (BIA) and taking numerous appeals, petitioner has succeeded in thwarting the Immigration Service in its attempt to enforce the valid deportation order entered more than eleven years ago.

*Id.* The court continued:

More than two years ago, then District Judge Walter R. Mansfield described petitioner's sojourn in this Country as "a nine year *tour-de-force*, in which he has used (and undoubtedly abused) every procedural tactic available for delay . . . ." (Schieber v. Esperdy, 70 Civ. 437 (S.D.N.Y. filed

Thus rebuffed, Schieber again prevailed upon his congressional sponsors to reintroduce a private measure on his behalf, and at the same time he beseeched the Board to reopen the deportation proceeding for reconsideration of his application for an adjustment of status, an avenue clearly unavailable to him.[23] Pendency of the bill and resolution of the new application spanned eighteen months more. Finally, on October 4, 1973, Schieber was served with a notice to report for deportation on October 17, 1973.

■■■ At the eleventh hour, however, Schieber received a stay of deportation—until January 24, 1974—because of the instability generated by the Yom Kippur War. He used that opportunity to make tapes for Radio Cairo, to be broadcast to the war front, urging Israeli soldiers to lay down their arms and withdraw to Israel's pre-1967 borders.[24] Thus having infuriated the Government and people of Israel, Schieber filed a new ·motion to reopen the deportation proceeding. He alleged that his anti-Israeli activities guaranteed that he would be subject to persecution if deported since they are regarded as violations of Israel's Consorting With the Enemy Act and no better than treason.[25] He also predicated the motion to reopen on the ground that the adverse Israeli reaction these broadcasts generated guaranteed that deportation would create an unusual hardship for him.[26] The motion to reopen was

February 20, 1970)). Judge Mansfield's observation is *a fortiori* applicable today. *Id.* This holding, of course, precludes Schieber from relitigating the issue of his ineligibility for § 245(a) adjustment of status by virtue of his excludability under § 212(a)(9) as one convicted of crimes involving moral turpitude in the absence of cogent and compelling new evidence, which he has failed to produce.

23. Section 244(a)(1) is discussed in note 14, *supra.* Schieber could not apply for relief under that subsection since denial of such relief had been affirmed by the 1970 Second Circuit decision. See note 15, *supra.* Instead, he tried § 244(a)(2), which provides that specified categories of excludable aliens may apply to the Attorney General for a removal of the infirmity if they have had ten years continuous presence here, have been of good moral character during that time, and are aliens "whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship . . . ." 8 U.S.C. § 1254(a)(2) (1970). The subsection does not, however, apply to Schieber because he is not a member of those classes of deportables to which the section by its terms exclusively applies.

24. Before his arrival in this country, Schieber's political activity had been primarily anti-Communist. Late in his stay in Israel, and more forcefully since his arrival in this country, he has become anti-Zionist. In that vein, he is one of the founders, and currently the chairman of, the Holy Land State Committee, which actively supports the establishment of a confederal Holy Land State in the Middle East in which Christians, Moslems and Jews would each have home rule. He is a frequent contributor to Arabic-language publications, including ACTION, a newspaper dedicated to the

"liberation" of Palestine. Obviously these activities, particularly the Radio Cairo broadcasts during the Yom Kippur War, have, more than his antigovernment, anti-Socialist activity of the 1950s, caused him to be extremely unpopular in Israel, not only in governmental circles but also among the population at large.

25. See note 5, *supra.* Of course, the § 243(h) issue is precluded him by the Ninth Circuit's 1965 decision discussed in note 11, *supra,* unless the Yom Kippur broadcasts and Schieber's anti-Zionist activity for the past ten years have so poisoned the relationship between him and the Israeli State that the likelihood that he would be subject to "persecution on account of race, religion, or political opinion" has increased to the point that it was an abuse of discretion for the Board to decline to reconsider its earlier refusal. This is not such a case, because even if the Yom Kippur broadcasts constituted illegal or treasonous acts under the law of Israel, it is not unreasonable for the Attorney General to refuse to classify punishment for that treason as "political persecution" within the meaning of § 243(h).

26. See note 15, *supra.* Here again petitioner is attempting to avoid the *res judicata* effects of a prior adverse decision—in this case, the 1970 Second Circuit decision discussed in note 16, *supra*—by showing that recent events had substantially altered things to an extent which undercut the earlier decision and compels reopening of his case. His argument is that, if deported, he will be jailed for treason; this, he submits, is the extraordinary hardship required by § 244(a) to be demonstrated and which the Board held in 1970 he had failed to show. It is further alleged that even absent incarceration, he still will face the constant threat of assassination by an outraged citizen; furthermore, at his age (61) and given his unpopularity, it is

denied, as were petitions for review in the Second Circuit [27] and for habeas corpus in the Southern District of New York.[28] This litigation caused the postponement of deportation until May 1, 1974.

On April 23, 1974, Schieber filed still another petition to reopen, which precipitated the matter now before us. The Board, however, denied a stay of deportation pending consideration of the petition.[29] When, on May 1, 1974, INS for the first time attempted to physically deport Schieber, he slashed his wrists sufficiently to require hospitalization. On May 20, 1974, the Board took the

action which became the subject of the instant petition for review. It rejected his eleventh motion to reopen the deportation proceeding but, *sua sponte*, granted him one last opportunity voluntarily to depart for any country that would admit him.[30]

Schieber then moved to Washington and began canvassing the embassies in search of a receptive country.[31] Meanwhile, INS held off deportation to give Schieber a reasonable time within which to find a haven. In August, the District Director gave Schieber one more (final) extension of time—until September 13,

likely that he will become a charge on the state, instead of remaining the self-sustaining successful businessman he now is. The only one of these factors arguably not considered in the earlier decision he seeks to avoid is the consequence of his allegedly treasonous activity during the Yom Kippur War. Standing alone, this possibility of incarceration upon deportation does not render the Attorney General's decision not to reopen the deportation proceedings to reconsider the hardship issue an abuse of discretion.

27. Schieber v. INS, No. 74–1099 (Feb. 19, 1974).

28. Schieber v. Marks, Civ. No. 74–645 (Feb. 8, 1974).

29. This was an unusual move, but not unwarranted in light of the fact that this was the eleventh petition to reopen and covered the same points so recently rejected. It comported with the Second Circuit's disinclination to permit the automatic stay provision of 8 U.S.C. § 1105a(a)(3) to go into effect upon Schieber's January, 1974, petition. Both the Board and the court clearly served notice that they did not intend to further continue the date of Schieber's deportation any longer. We take the same step.

30. The Board first denied Schieber's motion for oral argument on the motion to reopen and reconsider. The Board denied the § 244(a)(1) motion because Schieber raised no points not precluded by the Board's January 9, 1970, and June 20, 1973, orders. The Board rejected Schieber's contention that *Asimakopoulos* required a new hearing by noting that the *Lee* rule had been only one of several factors for denial of discretionary relief under § 244(a)(1),

and that it would still consider dilatory litigation as one among many factors to justify denial of § 244 relief even after *Asimakopoulos*. See note 15, *supra*.

On the § 243(h) ground advanced, the Board held that while the Yom Kippur broadcasts were "new evidence," strictly speaking, "it is similar to the anti-Israeli actions on his part that he has previously urged in support of prior unsuccessful section 243(h) claims."

The order concluded:

FURTHER ORDERED: The outstanding order of deportation is withdrawn and the respondent is permitted to depart voluntarily from the United States to any country of his choice, without expense to the Government within such time and under such conditions as may be determined by the District Director; and upon his failure so to depart when and as directed, the deportation order shall be reinstated without further notice or proceedings.

As he had in the tenth denial in June, 1973, Member Warren Torrington dissented on the ground that Schieber had made a prima facie showing of eligibility for § 244(a)(1) relief and ought to have a hearing on that issue. He was apparently not disturbed by the fact that the same issue had been litigated over and over again, relying instead on the fact that Schieber was 63 years old and he had been a model citizen for his fifteen years here.

31. See attachment 2 to Schieber's opposition to the motion to vacate the stay. The main snag is his age and financial condition; he is too old to obtain a work visa, and does not have enough assets to reassure any prospective country of his financial self-sufficiency.

1974, when the deportation order would be executed.

Quite predictably, Schieber then, on September 10, 1974, filed the petition for review by this court, and that, as we have said, had the effect of automatically staying deportation.[32] INS has moved to vacate the statutory stay and Schieber has opposed the motion. Additionally, Schieber has filed his brief on the merits together with a motion to hold the motion to vacate in abeyance pending review, and INS has presented its opposition to that motion.

## II

There has been a perfectly valid final order of deportation outstanding against Schieber since March 22, 1961. His success in staving it off might well be viewed not only as an anamoly but indeed an injustice to all those other non-preference and excludable aliens[33] not affluent enough to afford counsel, influential enough to obtain congressional backers, or newsworthy enough to rally media support. The record yields not

the slightest hint of political motivation behind the effort to deport Schieber; from aught that we can detect, the INS is motivated solely by an understandable desire to enforce its deportation orders after a reasonable opportunity for administrative and judicial review has been exhausted. Evenhanded and effective enforcement of the immigration scheme enacted by Congress demands vacation of the statutory stay unless good cause to further delay Schieber's deportation satisfactorily appears.

■ In order to rule on the motion to vacate, we have carefully reviewed the voluminous record in this case and the briefs filed on behalf of Schieber. This review convinces us beyond cavil that his petition for review is baseless. We accordingly grant the motion to dissolve the statutory stay and *sua sponte* dismiss the appeal.[34]

Schieber has never contested the validity of the original deportation order or his excludability as an alien who overstayed his visa.[35] Each of his various motions to reopen has been filed for the

**32.** 8 U.S.C. § 1105a(a)(3) (1970) provides in part:

> The service of the petition for review upon such official of the Service shall stay the deportation of the alien pending determination of the petition by the court, underline the court otherwise directs.

(Emphasis supplied).

This provision has been the keystone of Schieber's fight to avoid deportation since 1961. The present petition is his seventh petition for review after one in the Ninth and five in the Second Circuit. As noted above, see note 29, *supra*, the Second Circuit, before disposing of his most recent review petition in the summer of 1973, vacated the § 1105a(a)(3) stay. The instant motion invoking the language underscored above requests this court to take the same step.

The other key to Schieber's strategy was the INS practice of staying deportation pending resolution of motions to reconsider by the Board and during the pendency of private bills in Congress. For nearly every moment since March 22, 1961, Schieber has been the beneficiary of one of these or of a § 1105a(a)(3) stay of deportation. The administrative stays have

dried up, the private bills have been defeated, the Second Circuit has refused to sanction further delay. We now close the last avenue of postponement by following the lead of the Second Circuit in vacating the statutory stay.

**33.** See note 9, *supra*.

**34.** One who wishes to proceed on appeal *in forma pauperis* must present a nonfrivolous issue or face dismissal. United States v. Marshall, 166 U.S.App.D.C. 412, 414, 510 F.2d 792, 794 and n.8 (1975). The same principle applies with equal force to a paid appeal. Coppedge v. United States, 369 U.S. 438, 446–50, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962); United States v. Johnson, 327 U.S. 106, 113, 66 S.Ct. 464, 90 L.Ed. 562 (1946); Brown v. United States, 110 U.S.App.D.C. 310, 311, 293 F.2d 149, 150 (1961). *Cf.* Ellis v. United States, 356 U.S. 674, 675, 78 S.Ct. 974, 2 L.Ed.2d 1060 (1958). *And see* Williams v. United States, 115 U.S.App.D.C. 158, 159, 317 F.2d 569, 570 (1963).

**35.** See note 3, *supra*.

 

purpose of obtaining *discretionary* relief—on grounds of possible political persecution, potential hardships or circumstances warranting an adjustment of status. Absent a substantial change of situation, the Ninth Circuit decision precludes relitigation of the political persecution issue,[36] and the 1970 Second Circuit decision forecloses reexamination of the hardship issue.[37] We have already adverted to the plain insufficiency of the case for status adjustment.[38]

Schieber argues that the increased pace and virulence of his anti-Zionist activity since 1965 justifies reopening the issue closed in that year by the Ninth Circuit. The mutual antipathy between Schieber and his own country may have deepened over the years, but we perceive nothing rendering Schieber any more susceptible to "political persecution" now than he was in 1965.[39] On the point, which is his main argument, Schieber does not advance any new evidence, but argues that an intervening decision of a sister circuit—Asimakopoulos v. INS[40]—compels relitigation of the issue resolved in 1970 by the Second Circuit. The short answer is that the INS did not rely solely on the *Lee* rule to deny Schieber relief as it had in *Asimakopoulos.* Moreover, the Second Circuit had considered and rejected an *Asimakopoulos* argument in its 1970 *Schieber* decision, and this court should certainly not interfere with that judgment.[41]

Hence, to the extent that the claims he advances are not foreclosed by *res judicata* on the statute defining judicial reviewability[42]—that is, to the extent that he has come forward with genuinely new evidence or has raised a slightly different point[43]—it was clearly not an abuse of discretion for the Board to have refused to reopen the proceedings at this late stage. Since Schieber presents no nonfrivolous issues for decision by this court, we *sua sponte* dismiss his petition for review.

---

**36.** See note 11, *supra.*

**37.** See notes 15, 16, *supra.*

**38.** See note 7, *supra.*

**39.** See note 25, *supra.*

**40.** *Supra* note 15.

**41.** See note 26, *supra*; Goon Wing Wah v. INS, 386 F.2d 292, 293–294(1st Cir. 1967).

**42.** See note 11, *supra.*

**43.** See 8 C.F.R. § 3.2 and note 4, *supra.*