Michael Anthony MABUGAT, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 89–70513.

United States Court of Appeals, Ninth Circuit.

Submitted April 4, 1991.[*]

Decided June 17, 1991.

---

[*] The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34-4 and Fed.R.App.P. 34(a).

Gary Silbiger, Silbiger & Honig, Los Angeles, Cal., for petitioner.

Norah Ascoli Schwarz, Office of Immigration Litigation Civil Division, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before KOZINSKI and O'SCANNLAIN, Circuit Judges, and McNAMEE,** District Judge.

O'SCANNLAIN, Circuit Judge:

This immigration case involves a ripple from the upheaval which led to the toppling of the Marcos regime and installation of the Aquino government in the Philippines in 1986.

I

In early 1983, petitioner Michael Mabugat, a Filipino, was employed as a "section manager" for Proctor and Gamble in the Manila metropolitan area. During that politically turbulent time, Mabugat became associated with the Unido Party. The Unido Party stood in opposition to the Marcos regime; its most prominent members are now the ruling leadership of the Philippines. President Corazon Aquino herself is an alumna of an Unido splinter group.

In the summer of 1983, Mabugat became involved in a scheme to divert money from Proctor and Gamble to his political party. Mabugat, at the behest of an officer of Unido, deposited 989,000 pesos (about 32,000–38,000 American dollars) meant for Proctor and Gamble into a bank account bearing Mabugat's name, and then promptly turned the money over to the Unido officer who masterminded the scheme. According to Mabugat's testimony, the officer told Mabugat that the money would be returned to him in three months, so that Mabugat could get the money back to Proctor and Gamble before the company's next scheduled internal audit.

From the nature of the scheme, Mabugat suspected the involvement of several others, including his immediate superior at Proctor and Gamble and the teller, at least, of the bank where Mabugat made the transfer. Most significantly, Mabugat believed that Proctor and Gamble acquiesced to the transfer, because it wanted to help the opposition but could not afford to be caught directly supporting foes of the government.

In any event, the scheme went awry. About one month after the diversion, the Marcos government forcibly closed the bank which was involved in the transfer. Mabugat began to wonder how Unido was

** The Honorable Stephen M. McNamee, United States District Judge for the District of Arizona, sitting by designation.

going to get the money back into the correct account. He learned that certain bank records had been destroyed in the closure, and that no money had been redeposited in his account from Unido or anyone else. After three months passed, Mabugat sought assistance from a high-ranking official of Unido, but received no aid.

Shortly thereafter, Mabugat was subpoenaed by a Philippine prosecutor to answer charges of "estafa," roughly translated to misappropriation of funds. The charges were instituted by Mabugat's superior at Proctor and Gamble. To Mabugat's knowledge, no one else was charged or even investigated with regard to the plan. Proctor and Gamble officials greeted Mabugat's tale with extreme skepticism, and refused his offer of 150,000 pesos (about $5,000) as a down payment on restitution, with the balance of the missing amount to be paid on a monthly basis.

After speaking with a number of individuals with Unido, Proctor and Gamble, and the bank, Mabugat realized that the outcome of his trial was not likely to be pleasant for him. Mabugat decided to emigrate. He entered the United States on a six-month visitor's visa on March 19, 1985.

Mabugat has remained in this country ever since, working as an industrial engineer and in other capacities. At some point, Mabugat obtained a false birth certificate, which indicates that he was born in Guam. He also told at least one American employer that he was "legal to work." Mabugat and his wife have two children, both American citizens by birthright.

Some two years after Mabugat's arrival in the States, the Immigration and Naturalization Service ("INS") began proceedings to deport Mabugat, who by that time had long overstayed the permissible length of his "visit." Upon his initial apprehension by INS officers, Mabugat presented them with the false birth certificate. Ultimately, Mabugat admitted deportability, and, on December 23, 1988, the immigration judge so found. The immigration judge then denied asylum under 8 U.S.C. § 1158 (section 208 of the Immigration and Nationality Act ("INA")), denied withholding of deportation under 8 U.S.C. § 1253(h) (INA § 243(h)), and denied voluntary departure under 8 U.S.C. § 1254(e) (INA § 244(e)). The immigration judge ordered Mabugat's deportation.

The Board of Immigration Appeals affirmed the immigration judge, dismissing Mabugat's appeal in a decision issued June 2, 1989. Mabugat timely filed a petition for review in this court.

## II

■ Mabugat contends that the Board wrongfully denied asylum and withholding of deportation. An alien is entitled to a withholding of deportation only if he demonstrates a "clear probability of persecution." *INS v. Stevic,* 467 U.S. 407, 430, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984). However, the alien may obtain asylum, in the discretion of the Attorney General, if he meets the lower threshold of harboring a "well-founded fear of persecution." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987). We review for substantial evidence supporting the administrative determination that the alien has failed to prove even a well-founded fear of persecution. *Arriaga–Barrientos v. INS,* 925 F.2d 1177, 1179 (9th Cir.1991); *Sanchez–Trujillo v. INS,* 801 F.2d 1571, 1578 (9th Cir.1986).

■ The basis for Mabugat's claimed fear of persecution is the pending Philippine criminal prosecution against him for "estafa." A criminal prosecution normally will not be "persecution" absent some improper government motive for pursuing the matter. *See Rodriguez–Rivera v. United States Dep't of Immigration & Naturalization,* 848 F.2d 998, 1005 (9th Cir.1988) (per curiam); *Laipenieks v. INS,* 750 F.2d 1427, 1436–37 (9th Cir.1985). Mabugat argues that he has been singled out for prosecution and will not get a fair trial for political reasons.

■ Substantial evidence supports the Board of Immigration Appeals's decision. As the Board noted, although prosecution was instigated under the Marcos regime, the opposition party for whom Mabugat

committed the alleged crime is now the party in power. Further, as the immigration judge pointed out, Mabugat remained in the Philippines for sixteen months after the criminal charges were first filed, and did not request asylum until long after he had arrived in this country (and, not coincidentally, after the INS had taken an interest in his presence here). Although Mabugat suspects that he may be the sacrificial victim in a political cover-up, he presented no evidence other than his own word on that point. In fact, Mabugat testified that he did not know whether the investigation into his apparent crime was active, or whether he was still wanted. We are not persuaded that the Board's decision can be overturned on such flimsy evidence.[1]

### III

Under 8 U.S.C. § 1254(e) (INA § 244(e)), a deportable alien may obtain voluntary departure "if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure." The immigration judge found Mabugat to be statutorily ineligible "due to his admission that he took money from his employer without permission and not under duress and coercion." The judge also indicated that she would have denied voluntary departure as a matter of discretion in any event, due to Mabugat's admission of that crime and his use of a fraudulent birth certificate. Citing the same factors, the Board of Immigration Appeals found no error in the immigration judge's actions.

Mabugat challenges the denial of voluntary departure on a number of grounds. He contends that the immigration judge's finding of statutory ineligibility was erroneous, because the theft which Mabugat

purportedly committed occurred more than five years before Mabugat's application for voluntary departure. Mabugat also presents a multi-pronged challenge to the discretionary denial of his application, asserting that he did not admit to the specific elements of any crime, that any crime he may have committed was a purely political offense, that use of his admissions violated due process, and that the immigration judge failed properly to balance the equities.[2]

### A

■ In examining the certified administrative record, we note that few of these arguments were even indirectly raised before the Board. There is no contention that Mabugat's purported crime occurred more than five years before the application for voluntary departure, or that he had not admitted a crime involving moral turpitude. Mabugat's failure to exhaust his administrative remedies strips this court of jurisdiction to address these issues. *Vargas v. United States Dep't of Immigration & Naturalization*, 831 F.2d 906, 907–08 (9th Cir.1987).

### B

■ Although Mabugat did not raise his due process argument below, such claims, when not based upon mere procedural mistakes, are not subject to the exhaustion requirement. *See Vargas*, 831 F.2d at 908. The claim, however, is meritless. The Supreme Court has made clear that a civil deportation proceeding is supposed to be a "streamlined" process in which "various protections that apply in the context of a criminal trial do not apply." *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483–84, 82

---

1. We also note that recent alleged human rights abuses occurring in the Philippines to which Mabugat draws our attention seem to be directed exclusively toward Communists or their supporters. There is no suggestion that Mabugat is, or is thought to be, sympathetic to the communist rebels.

2. Although our jurisdiction is limited to a review of the Board's decision, rather than the immigration judge's, *see Elnager v. INS*, 930 F.2d 784, 787 (9th Cir.1991), here the Board appears to have adopted (or at least relied upon) the immigration judge's findings and conclusions to make its decision. Thus, any errors made by the immigration judge have been perpetuated, rather than corrected, by the Board.

L.Ed.2d 778 (1984). We see no reason to declare unconstitutional the statute, 8 U.S.C. § 1101(f)(3), which permits admissions in lieu of convictions for the purposes of determining "good moral character."

## C

We are left with Mabugat's contentions that his "crime" was purely political, and that the immigration judge improperly balanced the equities in denying voluntary departure. Because the Board's terse statement of agreement with the immigration judge does not indicate whether it too considered Mabugat statutorily ineligible for voluntary departure, or simply unworthy as a matter of discretion, we will consider both questions.

### 1

■ Based on the evidence before her, the immigration judge declared Mabugat statutorily ineligible for voluntary departure for want of good moral character. *See* 8 U.S.C. § 1254(e) (INA § 244(e)). To the extent the Board relied upon this conclusion in upholding the denial of Mabugat's application, we review the finding of statutory ineligibility for substantial evidence. *See Hernandez–Luis v. INS*, 869 F.2d 496, 498 (9th Cir.1989).

■ As we have described in some detail above, Mabugat freely admitted his involvement in the diversion of over $30,000 from his employer to his political party. However, Mabugat also testified that he did not take the money for his own use, did not intend to deprive his employer of the money permanently, and in fact believed that his Proctor and Gamble superiors had approved the temporary diversion. Mabugat's testimony was uncontroverted.

In her oral decision, the immigration judge recounted the money diversion scenario as described by Mabugat, including that Mabugat "assumed that the ... arrangement was approved by Proctor and Gamble, since it had been set up in ad-

vance." The immigration judge described Mabugat's testimony as "candid and forthright," and that he testified in an "open, and honest and animated manner," consistent with his application. Although the immigration judge harbored doubts regarding Mabugat's fear of persecution,[3] she did not question the sincerity of his testimony concerning the diversion scheme.

Nonetheless, the immigration judge concluded that Mabugat "acted as a thief," apparently because she considered Mabugat to have "openly admitted committing a crime involving moral turpitude in the Philippines." In her view, the supposed admission rendered Mabugat statutorily ineligible for voluntary departure. *See McNaughton v. INS*, 612 F.2d 457, 459 (9th Cir.1980) (per curiam) (crime involving intent to defraud is a crime of moral turpitude); *see also Delgado–Chavez v. INS*, 765 F.2d 868, 869 (9th Cir.1985) (per curiam) (embezzlement is crime of moral turpitude).

We perceive two difficulties with the immigration judge's conclusion. First, the immigration judge's decision appears to betray a fundamental misunderstanding of Mabugat's testimony. If Mabugat can be taken at his word, there does not appear to be any crime committed at all, much less a crime of moral turpitude. If the temporary diversion of funds from a knowing and participating employer for political ends does indeed constitute the crime of estafa in the Philippines, there certainly should have been some evidence introduced of that fact. As it stands, Mabugat does not appear to have admitted a crime at all; rather, he denies any mens rea, any intent to deprive permanently, or even a nonconsensual taking, all of which presumably are necessary to convict. Since the immigration judge's conclusion that Mabugat had committed a crime was based expressly upon Mabugat's supposed admissions, it appears that the conclusion was based on a misunderstanding.

---

**3.** In the immigration judge's opinion, Mabugat's testimony that he feared persecution by unfair trial was undermined by his failure to leave the Philippines until sixteen months after criminal charges were first filed, and by his failure to file for asylum status until years after he arrived in the States.

Furthermore, even if it could be said that Mabugat had admitted some sort of theft, Mabugat still has at least a colorable claim that the offense was "purely political." *See McMullen v. INS*, 788 F.2d 591, 595 (9th Cir.1986) (a political offense is one "committed out of 'genuine political motives' ... directed toward the 'modification of the political organization or ... structure of the state' and [there was a] direct, 'causal link between the crime committed and its alleged political purpose' ") (citation omitted). The immigration judge made no finding on that point. Although the INS contends that the political character of any crime is irrelevant in this context, we must disagree.

■ From the statutory scheme of title VIII, it is clear that whether a crime of moral turpitude can be characterized as a "political offense" is a consideration related to the alien's excludability, rather than to his deportability. Section 1182 declares that an alien who has committed a crime of moral turpitude is not disqualified from admittance to this country if the crime fits the "political offense" description. 8 U.S.C. § 1182(a)(9) (INA § 212(a)(9)). Numerous differences exist between the exclusion and deportation statutes. One of these differences is that the "political offense" exception does not exempt an alien who has committed a crime of moral turpitude from deportability. *See Cabasug v. INS*, 847 F.2d 1321, 1324 (9th Cir.1988) (dicta) (comparing 8 U.S.C. § 1182(a)(9) and 8 U.S.C. § 1251(a)(4)).[4] The "political offense" exception simply plays no part in the determination of deportability. That said, however, it by no means follows that the "political offense" doctrine is irrelevant to the specific question posed by this case: whether an alien who has committed a political crime may nonetheless be eligible for voluntary departure.

Statutory eligibility for section 1254(e) voluntary departure turns on whether the alien has been a person of "good moral character" for at least five years. "Good

moral character" is defined in section 1101(f). In that section, the INS is granted wide discretion in evaluating the applicant's character. *See, e.g.,* 8 U.S.C. § 1101(f) (permitting a finding that a person is not of good moral character despite his absence from the listed categories of undesirables); *id.* § 1101(f)(3) (permitting a finding that a person is not of good moral character although the person is not excludable).

Although Congress granted the INS latitude in making these character determinations, it did not strip the inquiry of all guideposts. Rather, in section 1101(f)(3), Congress specifically directs the INS's attention to section 1182(a)(9), in which the "political offense" doctrine appears.

Congress clearly knew what it was doing when it noted the relevance of section 1182(a)(9) to any determination of whether an emigre's moral character passes muster. When (as here) the analysis focuses upon the morality or character of the alien applicant, whether the crime of moral turpitude qualifies as a "political offense" is logically and directly relevant to an evaluation of that person's worthiness for an alternative to involuntary deportation. *Cf. O'Rourke v. Warden, Metro. Correction Center,* 539 F.Supp. 1131, 1138 (S.D.N.Y.1982) (if the petitioner's criminal record were being used to determine his moral character or trustworthiness, "it would surely be relevant that [petitioner]'s crimes were not the crimes of a petty criminal, but rather the crimes of one believing that he was fighting in a war of national liberation"). It hardly would make sense for Congress to permit visa applicants to enter this country despite "excused" crimes of moral turpitude, but to deny voluntary departure to precisely those people who can least afford to be returned to their native countries— those who committed political crimes in their homelands.

Certainly, the INS has never considered itself bound to deny voluntary departure even to those who are actually excludable

---

4. Since *Cabasug,* section 1251 has been amended. However, the amendment has neither removed crimes of moral turpitude from the deportability statute nor added the "political offense" exception. *See* 8 U.S.C.A. § 1251(a)(2)(A)(i) (West Supp.1991).

under section 1182(a)(9). *See, e.g., Mariano v. INS,* 537 F.2d 686, 690 (2d Cir.1976); *Schieber v. INS,* 520 F.2d 44, 49–51 (D.C. Cir.1975) (per curiam). If Mabugat's story is to be credited, he may well not even be excludable under the same section. While we cannot say that the "political offense" exception absolutely bars a finding of statutory ineligibility for voluntary departure, we do regard the political nature of any crime being considered in connection with a "good moral character" inquiry to be relevant.

The immigration judge seems to have misperceived the legal consequences of Mabugat's admitted actions, apparently assuming that he had admitted to committing a crime of moral turpitude. In evaluating Mabugat's moral character, she did not give any consideration to the political nature of any crime he may have committed, and whether under the circumstances it was appropriate to regard that crime as a disqualification from consideration for voluntary departure. Given these inconsistencies and gaps in the analysis, the finding of statutory ineligibility does not have substantial support in this record.

### 2

As an alternative basis for her decision, the immigration judge assumed that Mabugat was statutorily eligible for voluntary departure and then denied the application as a matter of discretion, weighing what she perceived to be the positive and negative factors. A discretionary denial of voluntary departure is reviewed, naturally, for an abuse of discretion. *See Villanueva–Franco v. INS,* 802 F.2d 327, 329 (9th Cir.1986). We examine whether the exercise of discretion was "arbitrary or capricious." *Estrada–Posadas v. INS,* 924 F.2d 916, 920 (9th Cir.1991) (quotation omitted).

We disagree with Mabugat's contention that the positive equities were disregarded. The immigration judge specifically noted Mabugat's family situation and his pending H–1 petition, and was aware that Mabugat had entered the United States legally. Although the immigration judge did not specifically note Mabugat's lack of a criminal record in her decision, she did directly ask him whether he had ever been convicted of a crime shortly before she rendered her oral decision, and there is no indication that she disbelieved his response.

As to the negative factors, however, the immigration judge's (and Board's) heavy reliance on the supposed crime of moral turpitude that Mabugat purportedly admitted infected the entire balancing process.[5] It is clear from the record that far and away the most prominent negative factor was the alleged crime. Without a finding that there was a crime, and whether the crime was political and whether its impact was thus neutralized or at least mitigated, it was improper and an abuse of discretion for the Board and immigration judge to include this incident as a negative factor in the balancing of equities.

### IV

Substantial evidence supported the finding that Mabugat did not have a well-founded fear of persecution, and thus we uphold the Board's denial of asylum and withholding of deportation. Lingering doubts remain, however, concerning the Board's treatment of Mabugat's "crime," and thus of its decision to deny voluntary departure. Without properly grounded findings on whether Mabugat committed a crime at all, and whether this crime was political, we conclude that the denial of voluntary departure was arbitrary. This case is remanded to the Board for further proceedings consistent with this opinion.

PETITION GRANTED.

---

5. Certainly, there were some negative factors which the immigration judge and Board properly considered. For example, it is clear that Mabugat obtained a false birth certificate, which he presented to INS officers, and that he claimed to be "legal to work." Although it is not clear whether Mabugat claimed American citizenship to his employer, his possession of the false certificate supports the Board's finding of a "false claim to United States citizenship."