SPRINGFIELD TELEVISION
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,

Greater New England Cablevision Co.,
Inc., et al., Intervenors.

No. 79–1203.

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1979.

Decided Nov. 29, 1979.

---

Martin E. Firestone, Washington, D.C., with whom Stein, Halpert & Miller, Washington, D.C., Samuel A. Marsella, and Doherty, Wallace, Pillsbury & Murphy, Springfield, Mass., were on brief, for petitioner.

Keith H. Fagan, Counsel, Washington, D.C., with whom John H. Shenefield, Asst. Atty. Gen., Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John J. Powers, III, and Frederic Frei-

licher, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

Edwin M. Durso, Washington, D.C., with whom Joseph R. Reifer, and Cole, Raywid & Braverman, Washington, D.C., were on brief, for intervenor Greater New England Cablevision Co., Inc.

Robert Alan Garrett, Evanston, Ill., with whom Alexander H. Hadden, New York City, James F. Fitzpatrick, and Arnold & Porter, Washington, D.C., were on brief, for intervenor, Commissioner of Baseball.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, DOOLING, Senior District Judge.*

COFFIN, Chief Judge.

A licensee of a television station and the Commissioner of Baseball here challenge an order of the Federal Communications Commission as arbitrary and capricious. The Commission's order denied a motion by the television station for a declaratory ruling that a nearby cable system must afford the station complete exclusivity for telecasts of Boston Red Sox baseball games in the Springfield, Massachusetts market. The Commission concluded that the cable system's practice of granting the station non-duplication protection for the scheduled 2½ hour length of the telecasts was reasonable. We affirm.

### I.

Springfield Television Corporation (STC) is licensed to operate television station WWLP, Springfield, Massachusetts. STC has contracted with station WSBK, Boston, for the right to carry telecasts of Boston Red Sox baseball games on WWLP. WSBK is the "flagship" station of a regional television network organized for transmission of Red Sox baseball telecasts.

Greater New England Cablevision Co. (GNEC) operates a cable television system in Wilbraham and Ludlow, Massachusetts, communities proximate to Springfield. Under FCC rules, Wilbraham and Ludlow are "local" to, because within thirty-five miles of, three television markets: the two hyphenated markets of Boston-Cambridge-Worcester, Massachusetts and Hartford-New Haven-New Britain-Waterbury, Connecticut, and the Springfield market. GNEC like every such cable television system must carry the signals of every station in its three local markets, 47 C.F.R. §§ 76.59(e), 76.61 (1978). Thus, GNEC carries the signal of WSBK and in May, 1977, relayed their telecasts of Red Sox games. At that time, STC learned that GNEC was carrying these games via WSBK and demanded that GNEC cease doing so. STC also filed a motion with the Commission requesting a declaratory ruling that GNEC must afford it syndicated and network exclusivity against WSBK and station WLVI, Cambridge.

The Commission has promulgated two batches of rules granting television stations, under certain circumstances, an exclusive right to telecast particular programs within a market as against more distant stations whose signals are imported by cable systems. These sets of rules are the syndicated programming exclusivity rules, 47 C.F.R. §§ 76.151 et seq., and the network programming exclusivity rules, 47 C.F.R. §§ 76.92, et seq. STC's request for a declaratory ruling alleged that GNEC's carriage of the WSBK Red Sox telecasts violated both the network and the syndicated exclusivity rules.

Two days before STC filed its motion, GNEC responded by blacking out the first 2½ hours of each baseball telecast. In opposition to STC's motion GNEC argued that this action gave STC sufficient network exclusivity. It further argued that STC's claim of syndicated exclusivity had already been adversely decided against STC by a prior Commission order that had been affirmed on appeal and was res judicata. See *Greater New England Cablevision Co., Inc.,* 45 F.C.C.2d 597 (1974), *aff'd sub nom. Springfield Television Broadcasting Corp. v. FCC,* 168 U.S.App.D.C. 78, 512 F.2d 992 (D.C. Cir. 1975).

---

* Of the Eastern District of New York, sitting by designation.

STC replied that prior litigation had not precluded its claim for syndicated exclusivity because it was now offering proof of specific economic injury caused by GNEC's carriage of the Boston station's Red Sox telecasts. This injury consisted of the threat by one advertiser to cancel sponsorship of WWLP Red Sox telecasts because of loss of audience share to the WSBK telecasts seen over GNEC. STC settled this threat by giving the advertiser substitute, or "make good", advertisements during WWLP's local newscasts. STC estimated the cost of affording the advertiser these "make good" spots would reach $7,000 by the end of the baseball season. However, this accommodation of the advertiser occurred before GNEC began to give STC 2½ hours of exclusivity for the baseball telecasts. The record is silent as to the advertiser's reaction to this degree of exclusivity. STC further argued that it was entitled to network exclusivity for the duration of each telecast.

In September, 1978, the Chief of the Commission's Cable Television Bureau issued an opinion and order denying STC's motion for a declaratory ruling, 44 R.R.2d 144. The Bureau held that WWLP was not entitled to syndicated program exclusivity against other stations that under Commission rules are local to Wilbraham and Ludlow. The Bureau treated STC's motion as a request for a waiver from the syndicated exclusivity rules and denied the waiver because the evidence of injury did not meet the Commission's standard.[1]

The Bureau acknowledged that STC is entitled to network exclusivity against the WSBK Red Sox telecasts, but ruled that GNEC's practice of affording 2½ hours exclusivity was sufficient. The rationale for this holding was the considerable difficulty cable systems face in manually switching back to a signal that has been blacked out during a network program when that program actually ends. The use of automatic switching equipment allows a cable system to set its equipment to return to the lower priority signal at a certain time, saving the cable system time and money. The Bureau thus thought it reasonable to allow GNEC to set its automatic equipment to switch back to WSBK at the scheduled completion of the ball game. As support for this determination the Bureau relied on *First Report and Order in Docket 19995*, 52 F.C.C.2d 519 (1975). There, the Commission had promulgated a rule that cable systems could set their automatic switching equipment for one hour after the scheduled conclusion of a sporting event telecast. The purpose of the rule was to prevent viewers from being deprived of the conclusion of a game when it ran beyond its scheduled length.[2]

STC appealed the Cable Bureau's ruling to the Commission. Both parties reiterated their positions. The Commissioner of Baseball (Baseball) intervened at this point.[3] Baseball offered no comments on STC's claim for syndicated exclusivity, but concerned himself solely with the issue of network exclusivity. Baseball argued that the Commission's network exclusivity rules required that the entire telecast of a sporting event over a distant signal be blacked out by the cable system. He argued that *Docket 19995, supra*, was primarily concerned with loss to viewers of the conclusion of sports telecasts and was not applicable here

---

1. The Cable Bureau quoted the applicable standard for waiver of a cable television rule from *Mission Cable TV*, 40 F.C.C.2d 705, 730 (1973): "The standard is not whether there will be loss of audience or advertising revenue to a television station but whether failure to grant the requested relief would result in a net loss of television service to the public."

2. *Docket 19995* dealt with the inverse situation to the one here. There, the cable system was required to delete the program following the sports telecasts. The Commission's rule allowed the cable system potentially to carry some of the forbidden program following the game. Here, the sports telecast is the forbidden program and the order under review allows the cable system potentially to carry some of the game. The constant factors common to the two situations are the unpredictable length of sporting events and the constraints presented by automatic switching.

3. The National Basketball Association also intervened before the Commission, but is not a party to this appeal.

because Springfield viewers were certain to see the completion of Red Sox games on WWLP and the present issue was whether they would see the conclusion on two stations.

In a brief memorandum and order the Commission affirmed the decision of the Cable Bureau, *Springfield Television Broadcasting Corp.*, 71 F.C.C.2d 611 (1978). The Commission ruled that prior decisions had already established that STC's station WWLP was not entitled to syndicated exclusivity against stations that are "local" within the rules. The loss of a single advertiser was held insufficient to warrant a waiver of these rules. The Commission also ruled that 2½ hours of network exclusivity for a baseball telecast was sufficient, relying on the same reasoning as the Cable Bureau. Citing *Docket 19995, supra*, the Commission stated: "Given the difficulties inherent in manual switching of programs which occasionally run over, we are persuaded that providing nonduplication production instead for the scheduled 2½ hour length of the broadcast is a reasonable alternative." This appeal followed.

The issues presented on appeal organize themselves around the two clusters of Commission rules in dispute: the syndicated exclusivity rules and the network exclusivity rules.

**II.**

STC's claim of entitlement to syndicated exclusivity against the Boston and Cambridge stations is bottomed on its allegation that the Commission's decision to treat those stations as "local" to Wilbraham and Ludlow is arbitrary and capricious. Al-

though these Boston area stations are eighty miles from Springfield, they operate in a hyphenated market that includes Worcester, Massachusetts, which is less than thirty-five miles from Wilbraham and Ludlow. The cable rules require the cable systems to carry the signals of all television stations within any market where one station is within thirty-five miles. *See* 47 C.F.R. §§ 76.61(a)(4). The Commission demands this equal treatment by cable systems of all television stations in the same market to "equalize" the competitive positions of the stations. *See Cable Television Report and Order*, 36 F.C.C.2d 143, 176 (1972).[4] STC's station WWLP receives syndicated exclusivity against signals from more distant markets, those from New York City for example,[5] but not against signals from the "local" Boston-Cambridge-Worcester market.

STC argues that considering the Boston area stations "local" to the Springfield area is irrational on several grounds. Boston stations are not considered "local" to Springfield in Commission regulatory schemes other than the cable television rules. Boston stations put at best a weak signal over these communities when not relayed by a cable system. Finally, allowing GNEC to carry these signals, without affording WWLP syndicated exclusivity, economically injures STC. STC has made these arguments before. We believe that the decision in *Springfield Television Broadcasting Corp. v. FCC*, 168 U.S.App. D.C. 78, 512 F.2d 992 (D.C. Cir. 1975), precludes us from considering this issue of whether the Commission's designation of the Boston stations as "local" under the

4. Without this requirement of equal access to cable systems for all television stations in the same hyphenated market, Worcester stations, for example, would have cable viewers in Wilbraham and Ludlow but Boston and Cambridge stations would not. Stations in all three cities compete with each other and are viewed in all three cities. Presumably, some stations in the hyphenated television market could gain a fortuitous competitive advantage by being within 35 miles of more or larger cable systems. The equalization rule prevents this result. *See* 36 F.C.C.2d at 176.

5. Because Springfield is a "smaller market" under Commission rules STC is not entitled to any syndicated exclusivity. However, in *Greater New England Cablevision Co., Inc.* 45 F.C.C.2d 597, 598–99 (1974), the Commission required GNEC to afford STC "first fifty" television market syndicated exclusivity protection, i. e., the degree of exclusivity to which a station in one of the fifty largest markets is entitled, against more distant signals.

cable rule is arbitrary because of the doctrine of collateral estoppel.

In *Spectrum Cable Systems, Inc.*, 40 F.C. C.2d 1019 (1973), *reh'g denied*, 44 F.C.C.2d 867 (1974), and *Greater New England Cablevision Co., Inc., supra*, the Commission considered and rejected many of these same arguments by STC when granting cable systems authorization to operate in the Springfield area. STC appealed this adverse ruling to the Court of Appeals for the District of Columbia Circuit. The parties to that appeal included all the parties before this court with the exception of the present intervenor, the Commissioner of Baseball, who has confined his arguments to the issue of network exclusivity. STC argued there that the Commission had arbitrarily and capriciously failed to waive the cable rules allowing GNEC to carry the Boston and Connecticut stations as "local" and had arbitrarily denied them syndicated program exclusivity against the "local" stations. The grounds for this claim were the inconsistency of this rule with other rules that had viewed these stations as foreign and the adverse economic impact on WWLP. The court of appeals affirmed the FCC decision without opinion, *Springfield Television Broadcasting Corp. v. FCC*, 168 U.S. App.D.C. 78, 512 F.2d 992 (D.C. Cir. 1975). We think we can fairly say, despite the inherent opacity of an affirmance without opinion, that the Court must have ruled that the designation of the Boston area stations as "local" and the denial of any more syndicated exclusivity to STC were reasonable. A party may not relitigate in court any issue settled by prior agency proceedings which resulted in an order affirmed in the courts. *FTC v. Ruberoid Co.*, 343 U.S. 470, 476, 72 S.Ct. 800, 96 L.Ed. 1081 (1952).

■ STC all but concedes that these issues were decided in *Springfield Television, supra*. It argues, however that in this proceeding it introduced new evidence to the Commission which justifies a fresh look as its claim for syndicated exclusivity against the Boston area stations. This evidence, as mentioned above, consists of the threat of withdrawal by one advertiser from sponsorship of the Red Sox games. These games, however, are *network* programs, not syndicated programs. *See Maine Cable Television, Inc.*, 34 R.R.2d 1452 (1975). *See also* 47 C.F.R. §§ 76.5(0), 76.5(p). Thus, the evidence is essentially irrelevant to the issue of syndicated exclusivity, except insofar as the issue is precipitated by the rule allowing GNEC to carry the signal of WSBK, Boston, at all. Moreover, the advertiser's threat and subsequent settlement by accepting "make good" advertisements on another WWLP program occurred before GNEC began to provide a set amount of network exclusivity to the Red Sox telecasts. There is no indication that the advertiser is not satisfied with this degree of exclusivity or that the "make good" arrangement is still in effect. The introduction of new evidence into an agency proceeding will avoid the operation of collateral estoppel on appeal only when it is "cogent and compelling", *Schieber v. Immigration and Naturalization Service*, 171 U.S. App.D.C. 312, 315 n. 11, 520 F.2d 44, 47 n. 11 (D.C. Cir. 1975) (per curiam). Petitioner's evidence does not meet either aspect of this standard.

## III.

■ All parties agree that STC is entitled to the protection of network exclusivity. The issue in controversy is whether the Commission's conclusion that GNEC's allowance of 2½ hours of exclusivity is sufficient is a reasonable decision. In other words, was the Commission reasonable in allowing less than total nonduplication protection by the cable system? Our role as a reviewing court does not, of course, allow us to assess the wisdom of the Commission's policy determination, but merely to inquire if the Commission has acted reasonably and given "reasoned consideration to each of the pertinent factors." *Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

Baseball's advocate suggests that the Commission's ruling encompasses two separate conclusions. First, the network exclu-

sivity rules allow the provision of less than total nonduplication protection for a sports telecast that often will not end at a specific time. Second, 2½ hours is a reasonable amount of exclusivity for Red Sox telecasts. For the sake of clarity we will consider separately the Commission's reasoning for each conclusion.

As noted above, the Commission felt that allowing the cable system to afford exclusivity for only the scheduled length of the game was proper because it would enable the cable system to use automatic switching equipment. The cable system can program its switching equipment to return automatically to the signal which has been carrying the forbidden program at the time that program is scheduled to end. The obvious problem is that baseball games are not governed by any clock. One game, well pitched and deftly fielded, will be completed in little more than ninety minutes; another game may proceed through extra innings on toward infinity.[6] The cable system can provide complete nonduplication without "clipping" the end of the ball game or the beginning of the succeeding program by switching signals manually at the actual conclusion of the telecast. However, manual switching poses serious inconveniences to the cable system: someone must monitor the forbidden program to see when it ends (apparently an unusual practice); an additional person must get to manual switching equipment that is often remotely located at some distance from the studio.

■ The Commission explicitly based its decision on the difficulties inherent in manual switching, but did so in a somewhat conclusory fashion. The agency need not address every facet of an issue in scholarly depth, but must explain enough for the reviewing court to be able to discern the agency's path of decision. *See WAIT Radio*

*v. FCC*, 135 U.S.App.D.C. 317, 418 F.2d 1153 (D.C. Cir. 1969). What we require are "the indicia of reasoned analysis based on carefully weighed facts", *State of Maine v. C.A.B.*, 520 F.2d 1240, 1245 (1st Cir. 1975). The sufficiency of the Commission's explanation in this case is intimately tied to the applicability of *First Report and Order in Docket 19995*, 52 F.C.C.2d 519 (1975), relied on as precedent in the agency's decision.

■ In *Docket 19995*, the Commission allowed cable systems to set their automatic switching equipment for one hour after the scheduled completion of a sports telecast, notwithstanding the fact that this impinged on the network exclusivity due relevant television stations for the program following the sports telecast. The Commission points to this decision as establishing a principle that an accommodation can be made for the use of automatic switching equipment after telecasts of sports programs having no certain time of conclusion. STC and Baseball both note, however, that the primary concern of the F.C.C. in *Docket 19995* was the loss to viewers of the end of the game; here, the issue is whether viewers will see the conclusion of the game on two stations rather than one. Because loss of programming to viewers is not a problem here, they contend, *Docket 19995* offers no support for the decision under review. But a pertinent rule need not be controlling to provide a rational basis for an agency decision in a case of analogical similarity which implicates similar policies. *Docket 19995* is incomprehensible unless the Commission was making a substantial allowance for the use of automatic switching equipment in the context of sports telecasts that do not have a readily predictable time of termination. The goal of avoiding "clipping" could have been achieved while maintaining total nonduplication by requiring the cable system to

---

**6.** Baseball's independence from quotidian time is, in the eye of one of the game's observers, its most ineffable pleasure. "Within the ballpark, time moves differently, marked by no clock except the events of the game. This is the unique, unchangeable feature of baseball, and explains why this sport . . . remains somehow rustic, unviolent, and introspective . . . . Since baseball time is measured only in outs, all you have to do is succeed utterly; keep hitting, keep the rally alive, and you have defeated time." R. Angell, *The Summer Game*, 303 (1972).

There is no doubt that this same element bedevils television's attempt to cabin the game within the rigid grids of broadcast schedules.

switch manually. Thus, *Docket 19995* stands as some support for the proposition that the desirability of automatic switching justifies some increased risk that nonduplication will be less than total. We hold that the Commission's invocation and interpretation of this precedent, combined with its explicit, consistent statement provides the reasoned explanation necessary for this court to affirm its policy decision. Though the agency may have come close, it did not "cross the line from the tolerably terse to the intolerably mute", *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (D.C. Cir. 1970) (footnote omitted), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

Baseball cites to us certain F.C.C. cases, such as *Teleprompter of Florida*, 68 F.C.C.2d 554 (1978), where the Commission has required cable systems to provide complete nonduplication protection even when to do so the cable system would have to revert to manual switching. Baseball attempts to point the moral that this case is a deviation from past Commission practice and courts will demand a more fleshed out justification of a new policy from the agency. *See State of Maine v. C.A.B., supra*, at 1243. This argument founders, however, because the Commission has explicitly ruled in *Docket 19995* that allowance will be made for the use of automatic switching in sports telecasts, which present the most significant problem of time overruns. The Commission there decided that it need not then address the problems of overruns and switching in other contexts. *Docket 19995, supra*, at 551. Thus, the present case offers no reversal of policy towards sports overruns and the cases cited by intervenor, which do not deal with sports telecasts, are inapposite.

■ Finally, we must consider whether the Commission's acceptance of the specific amount of time during which GNEC afforded WWLP network exclusivity, the scheduled 2½ hours of the telecast, is in itself reasonable. It is true that the basis for choosing the 2½ hour period is unclear; GNEC claims that this is the "scheduled" length, but we are told neither who determines the schedule nor upon what basis of data. No one, however, has contested that this is the scheduled length.[7]

Baseball's advocate has before this court stressed that the Commission's acceptance of this particular amount of nonduplication, doing nothing more than noting it was the scheduled length of the game, should be reversed because insufficient reasoning supports it. This is necessary, it is argued, because Baseball introduced statistical data tending to show that 2½ hours is significantly less than the average length of a Red Sox telecast, which evidence the Commission ignored. Baseball presented to the Commission a survey of the lengths of forty 1978 Red Sox telecasts showing that 27 of 40 lasted longer than 2½ hours. This evidence has caused us to pause and in an appropriate case we might remand to the Commission to address this data. However, a careful review of the pleadings before the Commission discloses that this issue was not properly raised there.

While it is true that Baseball put his data before the agency, he made no argument based on the data that the length of time proposed was unreasonable in itself. Baseball restricted his argument to the point that the entire broadcast must be deleted. Indeed, at one point Baseball averred: "The issue here . . . is not whether GNEC properly estimated the average length of a game."

In prior cases we have remanded orders to an agency when it has ignored pertinent arguments and supporting data. *See State of Maine v. C.A.B., supra; Presque Isle TV Co. v. United States*, 387 F.2d 502 (1st Cir. 1967). Nonetheless, we do not see how the Commission can be required to address an ancillary issue when the parties do not so request and indeed go so far as to argue

---

7. The record does not disclose whether more time is scheduled for telecasts of doubleheaders. Assuming, however, that this schedule is in good faith—an assumption not contradicted by the record—we expect that some appropriate enlargement of the period of deletion occurs when two games are televised rather than one. At oral argument, counsel for GNEC claimed that this was so.

that the issue is not on the table. *Cf. WAIT Radio v. FCC, supra,* at 1157 ("[a]n agency need not sift pleadings and documents to identify [meritorious] applications, but allegations such as those made by petitioners, stated with clarity and accompanied by supporting data, are not subject to perfunctory treatment").

In the absence of clear arguments to the Commission that it should not accept the scheduled length of the telecast as the appropriate duration of the deletion or that 2½ hours is not the scheduled length, we believe the agency could state its decision on this point in a summary manner. Our conclusion is buttressed by the fact that the Commission previously has used scheduled length as the benchmark for the appropriate time for automatic switching in the most nearly analogical situation previously addressed. In *Docket 19995, supra,* at 551, the Commission allowed automatic switching equipment to be set one hour after the *scheduled* completion of a sports telecast. Thus, the Commission is not here adopting any new standard, and the burden of explanation is accordingly lessened.[8]

*Affirmed.*

8. In sustaining the Commission in these circumstances, we are not of course taking a position on the merits of 2½ hours as opposed to some other fixed period.