# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1840

_____

| | | |
|---|---|---|
| Titilayo Falaja, Adebayo Falaja, | * | |
| | * | |
| Petitioners, | * | |
| | * | |
| | * | On Appeal from the Decision |
| v. | * | of the United States Board of |
| | * | Immigration Appeals. |
| Alberto Gonzales, Attorney General | * | |
| of the United States of America,[1] | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: February 18, 2005
Filed:   August 15, 2005

_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and GRUENDER, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Titilayo Falaja (Titilayo) and her son Adebayo Falaja (Adebayo) appeal the decision of the Board of Immigration Appeals (BIA) denying their applications for asylum, withholding of removal, relief under the United Nations Convention Against Torture (CAT), and adjustment of status to lawful permanent residents. Adebayo also

_____

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Alberto Gonzales is automatically substituted for his predecessor, John Ashcroft, as respondent.

moves for a stay pending appeal of the BIA's grant of voluntary departure. We affirm the decision of the BIA and grant Adebayo's motion for a stay.

## I.

The Falajas are natives and citizens of Nigeria who entered the United States as nonimmigrant visitors on February 1, 1992, and remained beyond their authorized stay. On July 25, 1994, Titilayo filed an application for asylum and withholding of removal that included Adebayo as a derivative beneficiary of her application. An asylum officer interviewed Titilayo in 1999 and referred the application to the immigration court. The Immigration and Naturalization Service (INS) initiated removal proceedings in October 1999 by issuing a Notice to Appear, which charged that the Falajas were removable from the United States as aliens who remained in the United States without authorization from the INS after their period of admission as visitors for pleasure had expired. See 8 U.S.C. § 1227(a)(1)(B) (2000).

At a hearing before an immigration judge (IJ) on February 3, 2000, the Falajas conceded the charge of removability. They declined to designate a country of removal, and the IJ designated Nigeria. The Falajas renewed their request for asylum, withholding of removal, protection under the CAT, or voluntary departure. Following a hearing on the merits in December 2000, wherein the Falajas testified and submitted evidence, the IJ denied relief after finding significant aspects of Titilayo's testimony not credible. In lieu of removal, however, the IJ granted both petitioners voluntary departure.

The Falajas appealed to the BIA. During the pendency of the appeal, the Falajas asked the BIA to remand the case to the IJ for consideration of an application for adjustment of status—to that of aliens admitted for permanent residence—based upon Titilayo's receipt of an employer-based immigrant visa. See id. § 1255(a). The BIA granted the motion to remand. After holding a hearing on the adjustment of

status application, the IJ denied the application. The IJ concluded that Titilayo was ineligible for adjustment of status because she failed to meet the statutory requirement that a petitioner be "admissible to the United States." Id. The IJ found Titilayo inadmissable pursuant to Section 212(a)(6)(C)(i) of the Immigration and Naturalization Act (Act), which precludes admission to an alien who seeks to procure an immigration benefit by "willfully misrepresenting a material fact." Id. § 1182(a)(6)(C)(i). Relying on its earlier finding that Titilayo was not credible, the IJ determined that the Falajas made willful misrepresentations of material facts in order to secure the benefit of asylum. The IJ then reconsidered its previous grant of voluntary departure and entered a new order denying voluntary departure based on its finding of willful misrepresentations.

The Falajas appealed to the BIA. The BIA affirmed the IJ's decision denying asylum, withholding of removal, and relief under the CAT based upon the IJ's adverse credibility finding. The BIA also affirmed the IJ's decision denying the application for adjustment of status based upon findings that Titilayo made willful misrepresentations of material facts and testified falsely under oath in an attempt to obtain asylum. Concluding that Titilayo's false statements before the IJ barred her from establishing the requisite good moral character for voluntary departure, the BIA affirmed the IJ's denial of Titilayo's request for voluntary departure. The BIA found insufficient evidence, however, to support a finding that Adebayo gave false testimony and accordingly vacated the portion of the IJ's decision denying him voluntary departure. The BIA granted Adebayo a thirty-day voluntary departure period. This appeal followed.

The Falajas' basic claim is that they have a well-founded fear of religious persecution, particularly by Titilayo's father, should they return to Nigeria.[2] Titilayo

---

[2]In her 1994 asylum application Titilayo stated that she feared persecution in Nigeria based on religious, ethnic, and political grounds. In 1998, Nigeria became

was raised in a Muslim family, and her father was an imam at the local mosque. Titilayo testified that her father physically abused her often when she was a child. On an occasion when Titilayo was six years old and disobedient, he allegedly scarred both of her cheeks by cutting them with a knife. When Titilayo was ten years old, she fell and broke her wrist while her father was beating her. When she was about twelve years old, her father allegedly threw a knife at her, cutting her leg. Titilayo testified that the abuse increased when she began sneaking out of the house to attend a Christian church around the age of twelve. Titilayo's father told her that her conversion to Christianity was a disgrace to her family, particularly given his leadership position at the mosque. According to Titilayo, on multiple occasions her father threatened to kill her for converting to Christianity. When he found a Bible in her bag, he beat her. She testified that on a day that she went to church when she was seventeen years old, her father pushed her, causing her to cut her chin on a piece of metal. Titilayo alleged that her father had authority over her even after she left his house and married.

Titilayo also claims that she was persecuted because of her religion outside the family home. She testified that in October 1986, as she was leaving a Christian church with a group of Christians, six Muslims approached and yelled insults at them. Then the Muslims began beating the Christians, including Titilayo. No one was seriously injured. Titilayo also testified that in October 1987, Muslims interrupted the church service that she was attending by singing anti-Christian songs and threatening to kill the Christians. The Muslims beat the Christians with long sticks,

---

a democracy and a new leader came into power. Titilayo testified at her December 2000 asylum hearing that, given this change in government and other changes in Nigeria, the only persecution she feared should she return to Nigeria was abuse based on her Christian religion by her father, a Muslim. R. at 518, 522, 570. We note that Titilayo made no mention of her father in her asylum application. In the affidavit in support of the application, she noted only that her "parents have rejected [her]" because of her conversion to Christianity. Id. at 1116.

and Titilayo was bruised in the attack.  Titilayo and other Christians were then arrested and detained for four hours before being released.

Because she is Christian, Titilayo claims that she was thwarted in her efforts to own a farm and restaurant in Nigeria.  Shortly after she purchased a farm, it was burned while she was out of the country.  A neighbor told Titilayo that the farm was burned because she was a Christian.  For a short time, Titilayo also operated a restaurant in a bank building.  The restaurant was closed by the bank, however, when visiting bank executives complained that Titilayo was a Christian.

Titilayo testified that other members of her family who were Christians were also persecuted.  Her sister was injured when Muslims raided her Christian church; she later died from the injury.  In 1991, her mother-in-law and father-in-law were beaten by Muslims while attending a Christian church.  The Muslims set fire to the church.  Titilayo's father-in-law died from injuries sustained in the attack.  Titilayo was in the United States at the time, and her husband fled Nigeria and left two of her children with a friend in Lagos, Nigeria.  In 1993, Titilayo's father took the children from the friend's house and brought them to his house in Kaduna, Nigeria.  Titilayo testified that her father abused the children because Titilayo was Christian.  Titilayo's son soon left his grandfather's house and went to live with Titilayo's friend in Lagos.  But Titilayo's daughter remained living at his house until she left to attend college in 1998.  Titilayo claimed that in early 1998, her father tore her daughter's clothes off in the street and beat her daughter as punishment.

The Falajas seek review of the BIA's decision to uphold the denial of their requests for asylum, adjustment of status, withholding of removal, and relief under the CAT.  Adebayo further seeks a stay of the BIA's grant of voluntary departure until the issuance of our mandate in this action.

## II.

Because the BIA's decision is the final decision of the agency, it is the subject of our review. Ismail v. Ashcroft, 396 F.3d 970, 974 (8th Cir. 2005). To the extent, however, that the BIA adopted the findings or the reasoning of the IJ, we also review the IJ's decision as part of the final agency action. Id.

## III.

We begin our review by examining the BIA's denial of the Falajas' petition for asylum and its related denial of withholding of removal and relief under the CAT. Section 208 of the Immigration and Naturalization Act gives the Attorney General discretion to grant asylum to an individual who is a "refugee." 8 U.S.C. § 1158(b)(1) (2000). A refugee is defined by the Act as an alien who is unwilling or unable to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). An alien petitioning for asylum bears the burden of proving past persecution or a well-founded fear of future persecution on account of one of the enumerated factors. 8 C.F.R. § 208.13(a) (2004). A well-founded fear is one that is both "subjectively genuine and objectively reasonable." Ghasemimehr v. INS, 7 F.3d 1389, 1390 (8th Cir. 1993).

The BIA's determination that an alien is not eligible for asylum is reviewed under the substantial evidence standard. Perinpanathan v. INS, 310 F.3d 594, 597 (8th Cir. 2002). Pursuant to this standard, the BIA's determination that the Falajas were not eligible for asylum must be upheld if, based on the record as a whole, it is supported by "reasonable, substantial, and probative evidence." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). We may not overturn the BIA's decision unless the petitioner shows that "'the evidence was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" Perinpanathan, 310 F.3d

-6-

at 597 (quoting Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997)).  When an immigration judge makes a finding regarding an applicant's credibility, as in this case, we will defer to that finding if it is supported by a specific, cogent reason.  Mohamed v. Ashcroft, 396 F.3d 999, 1003 (8th Cir. 2005).  "It is well settled that an immigration judge is in the best position to make credibility findings because he or she sees the witnesses as the testimony is given."  Mayo v. Ashcroft, 317 F.3d 867, 871 (8th Cir. 2003) (internal quotations and citations omitted); see also Esaka v. Ashcroft, 397 F.3d 1105, 1109 (8th Cir. 2005) (attributing "much weight" to an IJ's credibility determination because the IJ is in the best position to evaluate an alien's testimony).

We find that the BIA's decision that the Falajas are not eligible for asylum is supported by substantial evidence.  Both the IJ and the BIA found Titilayo not credible.  This credibility finding was supported by multiple inconsistencies among Titilayo's statements in her asylum application, interview with an asylum officer, and testimony in the proceedings.  The IJ set forth a number of specific findings of discrepancies, which the BIA adopted.

First, the IJ was particularly critical of the fact that Titilayo made no mention of abuse by her father, nor the injuries that she allegedly suffered as a result, in either her 1994 application for asylum or her 1999 interview with the asylum officer.  The first time that Titilayo related the abuse, its relationship to her religion, and her purported fear of the abuse continuing in the future was at the 2000 asylum hearing.  Titilayo attempts to explain her early silence on the matter by asserting that she believed the abuse to be normal until "sometime after she came to the US."  Pet. Br. at 40.  She further argues that violence by a family member for religious reasons was not recognized by the BIA as a ground for asylum until 2000, leading her to change the basis of her asylum claim.  These explanations fall short.  At the time of her asylum interview, Titilayo had been in the United States for seven years, giving her time to learn that domestic abuse is not "normal."  Moreover, in her application for

asylum and affidavit in support, Titilayo gave detailed descriptions of many instances of abuse inflicted upon her and her Christian family members by Muslim fundamentalists, yet she only mentioned that her parents had "rejected" her because of her conversion to Christianity. If her father had abused her because of her Christianity, Titilayo likely would have related such abuse to support her claims of Christian persecution by Muslims and would have described the situation as part of her father's "rejection" of her. "Inconsistencies or omissions in any asylum application that relate to the basis of persecution are not minor but are at 'the heart of the asylum claim.'" Esaka, 397 F.3d at 1110 (quoting Kondakova v. Ashcroft, 383 F.3d 792, 796 (8th Cir. 2004)). Titilayo's claim for asylum is predicated on the fact that she was persecuted because of her Christian religion, placing the alleged abuse by her father at the "heart of her asylum claim." The Falajas' explanations for Titilayo's omissions do not convince us that the evidence before the BIA compelled a finding of fear of persecution. See Perinpanathan, 310 F.3d at 597.

The IJ next noted that when Titilayo finally did discuss the alleged abuse by her father, her testimony on the matter was inconsistent. Titilayo first testified at the asylum hearing that her father last abused her when she lived in his house during her final year of high school. She later testified that her father harmed her even after she moved from his house and was married. Moreover, while the abuse by her father allegedly stopped in the mid-1980s, Titilayo continued to live in Nigeria until February 1992. "The respondent's ability to stay in Nigeria for approximately another six years or so after the last alleged abuse of her father," noted the IJ, "would diminish the respondent's claims regarding the abuse by her father." IJ Decision of Jan. 10, 2001, at 12. On appeal, Titilayo does not explain the discrepancies in her testimony. Rather, she simply argues that the IJ ignored "the fact that women often are unable to leave their abusers for economic reasons." Pet. Br. at 43. By Titilayo's own testimony, however, this broad assertion does not hold true in Titilayo's case. While living in Nigeria, Titilayo was employed by Nigerian Airlines for six years and operated a restaurant and a farm. Titilayo testified that "[e]conomically, I can go

-8-

[back to Nigeria]. I can restart my business again by the grace of God." R. at 570–71. We thus find that the IJ's conclusion is supported by the record and we accord it substantial deference.

The IJ also identified a number of contradictions in Titilayo's story about the alleged Muslim attack that she and other Christians suffered outside of her church in October 1986. First, it is significant that Titilayo omitted any mention of this attack from her asylum application. She similarly did not discuss the attack at her interview with the asylum officer. When Titilayo testified about the attack for the first time at the asylum hearing, her testimony was inconsistent. Titilayo testified on direct examination that the Muslims beat her and her three children. But on cross-examination Titilayo stated that the Muslims did not hurt the children and that she only had two children at the time, as she was nine-months pregnant with the third. On appeal, the Falajas argue that the IJ was required to give Titilayo an opportunity to explain the omission in her application and the inconsistencies in her testimony. We determine that Titilayo had ample opportunity at the asylum hearing to address the matter. Titilayo's asylum application included a claim of religious persecution, and the application's omission of this alleged attack indicates that Titilayo embellished her asylum claim in her hearing testimony. Moreover, Titilayo was specifically informed on cross-examination that her testimony regarding this attack varied from her testimony on direct examination, yet she made no attempt to explain the inconsistency. We again conclude that the IJ's credibility finding is supported by the evidence.

The IJ also found it damaging that Titilayo failed to corroborate her asylum claim with letters from her family, medical records, or death certificates. Although Titilayo did offer a letter written by her daughter in support of the allegation that Titilayo's father abused her daughter, the letter contradicted Titilayo's testimony about the year of the beating and the extent of the resulting injuries. Accordingly, the IJ

-9-

found the letter not credible. Titilayo has not attempted on appeal to explain these inconsistencies or the general absence of documentary evidence.

The IJ found discrepancies between Titilayo's and Adebayo's testimony regarding the year that Titilayo's mother died and trips that Titilayo's husband made to the United States to visit Titilayo and Adebayo. The Falajas assert that these discrepancies were minor and not material to their asylum claim. While the BIA appears to have adopted all of the IJ's findings with respect to discrepancies, the BIA stated that "most" of the discrepancies were material to the asylum claim. BIA Decision of Mar. 9, 2004, at 1. The BIA's decision is unclear as to which discrepancies the BIA considered not material. In any event, we, like the BIA, hold that the discrepancies, taken as a whole, support the IJ's adverse credibility finding.

We note that the IJ discussed two additional alleged inconsistencies in Titilayo's testimony as reasons for finding Titilayo not credible. Upon examination of the record, however, we find no support for these additional reasons and therefore conclude that the BIA erred in adopting these specific reasons as support for the IJ's adverse credibility finding.[3] Nevertheless, we hold that the BIA's adverse credibility

---

[3] First, the IJ discredited Titilayo's testimony that the identical scars on each of her cheeks are the result of cuts inflicted by her father as punishment for her disobedience. The IJ noted that no mention was made of the scarring in Titilayo's asylum application or statement in support. The IJ stated that Adebayo had similar scars on his cheeks, and that Adebayo testified that his sister has the same scars and that he has seen other Nigerians with similar markings on their cheeks. The IJ concluded that it is "more plausible" that the scars are "some sort of a customary thing," than a result of abuse by Titilayo's father. IJ Decision of Jan. 10, 2001, at 8. We find no support for the IJ's conclusion regarding the origin of the scars. The record contains no evidence that facial scarring is a tribal custom in Nigeria, and the testimony of Titilayo and Adebayo suggests the opposite conclusion. Titilayo testified that, when she was younger, she and her father were the only members of their family with the scars. While two of Titilayo's three children were branded with the markings, Adebayo testified that he had not seen many Nigerians with the scars

-10-

finding is more than supported by the other cogent reasons given by the IJ and discussed above.

We conclude that specific, convincing reasons, such as the inadequate and contradictory nature of Titilayo's testimony, support the BIA's finding that Titilayo lacked credibility.  That finding makes the Falajas ineligible for asylum because they failed to prove persecution or a well-founded fear of future persecution on account of a protected ground.  See Aden v. Ashcroft, 396 F.3d 966, 969 (8th Cir. 2005).[4]

---

and that he had never been told that the scarring was a custom or practice in Nigerian culture.  We further note that since Titilayo does not claim that the scars were inflicted for reasons related to her religion, it was reasonable for Titilayo not to mention them in her application for asylum.

Second, the IJ stated that Titilayo's testimony regarding whether she was injured or mistreated during her arrest in 1987 was "somewhat contradictory."  Id. at 10.  We have reviewed Titilayo's testimony and find it consistent.  Titilayo clearly stated that, while she was injured during the beatings by the Muslims at the church, she was not mistreated while detained at the police station.

[4]In addition to the adverse credibility finding, the IJ alternatively denied the Falajas' claims as a matter of law, stating, "In addition, the Court would deny asylum as the respondent has failed to show that she has suffered past persecution based on one of the five grounds enumerated in the Act and also has failed to show that she has a well-founded fear of future persecution based on the five grounds enumerated in the Act."  IJ Decision of Jan. 10, 2001, at 16.  Specifically, the IJ found that Titilayo failed to establish a fear of persecution by her father and failed to show that the threat of persecution to Christians exists countrywide.  Id. at 12–16.  The Falajas challenge this alternative holding, arguing that the case of In re S-A-, 22 I. & N. Dec. 1328 (BIA 2000), mandates the granting of asylum.  Pet. Br. at 47–51.  Because the BIA upheld the denial of asylum, withholding of removal, and CAT relief solely based on the IJ's adverse credibility finding and did not address the alternative holding, we need not and do not address the Falajas' arguments against the alternative holding.  INS v. Ventura, 537 U.S. 12, 14 (2002).

Because we hold that the Falajas failed to demonstrate that they were eligible for asylum, we also hold that the Falajas failed to meet the higher burden of proof required for obtaining withholding of removal. See Krasnopivtsev v. Ashcroft, 382 F.3d 832, 840 (8th Cir. 2004) (ruling that to be eligible for withholding of removal an alien must show a clear probability that he or she will be persecuted in the country to which he or she is deported). While the Falajas also sought relief under the CAT, and while the IJ's adverse credibility determination and adverse decisions on asylum and withholding of removal are not determinative of a CAT claim, the Falajas have not argued on appeal that they met their burden under the CAT of establishing that "it is more likely than not that [they] would be tortured if [they] returned" to Nigeria. Esaka, 397 F.3d at 1112 (noting standard for relief under the CAT). Accordingly, we deem this claim waived. See United States v. Echols, 144 F.3d 584, 585 n.2 (8th Cir. 1998); United States v. Richards, 118 F.3d 622, 624 (8th Cir. 1997).

## IV.

The Falajas next appeal the portion of the BIA's decision upholding the IJ's conclusion that Titilayo is ineligible for adjustment of status to that of permanent resident because she is statutorily inadmissable to the United States.[5] We review the BIA's legal conclusions regarding Titilayo's admissibility and statutory eligibility for adjustment of status de novo, giving substantial deference to the BIA's interpretation of the immigration laws. Varela v. Ashcroft, 368 F.3d 864, 866 (8th Cir. 2004). We review the BIA's findings of fact under the substantial evidence standard, set forth above. Ateka v. Ashcroft, 384 F.3d 954, 957 (8th Cir. 2004).

---

[5]Adebayo filed a supplement to his mother's application for adjustment of status. Thus, Adebayo's eligibility for adjustment was dependent on Titilayo's eligibility for adjustment, and his application was necessarily denied when her application was denied.

-12-

The Attorney General, in his discretion, may adjust the status of an alien *if*, among other things, the alien is "admissible to the United States for permanent residence." 8 U.S.C. § 1255(a)(2) (2000); see also Varela, 368 F.3d at 866 (holding that an immigration judge had no jurisdiction to adjust an alien's status where the alien did not meet a statutory prerequisite for adjustment). An alien is deemed "inadmissible" and not eligible for adjustment of status, however, if he or she seeks to procure an immigration benefit by "willfully misrepresenting a material fact." 8 U.S.C. § 1182(a)(6)(C)(i) (2000). Citing the reasons previously set forth to support its adverse credibility finding, the IJ found that the Falajas made willful misrepresentations of material facts in their attempt to secure asylum. The BIA agreed that Titilayo's "inconsistent and contradictory statements, made to the Immigration Judge and the asylum officer while under oath, which pertained to alleged persecution, do constitute false testimony and willful misrepresentation of material facts which were proffered for the purpose of procuring a benefit under the Act." BIA Decision of Mar. 9, 2004, at 2. In accordance with this finding of willful misrepresentation, the BIA concluded that the Falajas were inadmissible to the United States and thus barred from receiving an adjustment of status.

The Falajas assert that the inconsistencies identified by the IJ to support the IJ's adverse credibility finding cannot, alone, support a finding that Titilayo willfully misrepresented material facts. The Falajas maintain that the IJ made no finding that the inconsistencies were willfully made and not simply "the result of poor memory or an evolving understanding of the type of abuse which can be characterized as persecution." Pet. Br. at 31. We recognize that inconsistencies between a petitioner's asylum application and hearing testimony, as well as internal inconsistencies in a petitioner's hearing testimony, may not equate to willful misrepresentations. In this case, however, the IJ and BIA specifically found that the inconsistencies were willfully made. The IJ stated, in multiple places, that it did not believe Titilayo's story. Similarly, the BIA stated that Titilayo's inconsistent statements constitute "false testimony." BIA Decision of Mar. 9, 2004, at 2. We find it of no import that

-13-

the "willful misrepresentation" finding was based on the same facts that support the "adverse credibility" finding, so long as substantial evidence supports both findings, as it does. See Salas-Velazquez v. INS, 34 F. 3d 705, 707 (8th Cir. 1994) (holding that evidence that supports a finding that petitioner entered into marriage to "obtain[] immigration benefits" could also support a finding that petitioner "evad[ed] . . . the immigration laws," even though the standards are not necessarily the same).

The Falajas also argue that, even if willfully made, the misrepresentations by Titilayo were not "material." Materiality is an issue of law. Kungys v. United States, 485 U.S. 759, 772 (1988). The test of whether a misrepresentation was material is whether it "was predictably capable of affecting, *i.e.*, had the natural tendency to affect, the official decision" of the agency. Id. at 771. The BIA made a specific finding that Titilayo's misrepresentations regarding persecution by her father and the alleged attack by Muslims in 1986 were "material to her asylum claim." BIA Decision of Mar. 9, 2004, at 2. We agree. These incidents, which allegedly involved abuse by Muslims because she was Christian, speak directly to Titilayo's claim of religious persecution. They thus have the natural tendency to affect the agency's decision regarding whether Titilayo established past persecution or a well-founded fear of future persecution.

Having reviewed the record, we conclude that substantial evidence supports the BIA's finding that Titilayo willfully misrepresented material facts in her attempt to gain asylum. This conclusion leads us to hold that, pursuant to the immigration laws, Titilayo is inadmissable to the United States and correspondingly ineligible for adjustment of status. We affirm the BIA's decision on this matter.[6]

_____

[6]Though the IJ was not required to do so, having found Titilayo not admissible and therefore ineligible for adjustment of status, the IJ went on to note that it would not exercise its discretion to grant adjustment of status. IJ Decision of Feb. 10, 2003, at 3. The Falajas argue that the reason given by the IJ for this decision was erroneous as a matter of law and that their due process rights were violated. Pet. Br. at 33–36.

-14-

## V.

The BIA concluded its decision by granting voluntary departure to Adebayo.[7] Pursuant to the BIA's grant, Adebayo was permitted to depart the United States "within 30 days from the date of this order or any extension beyond that time as may be granted by the district director." BIA Decision of Mar. 9, 2004, at 3. Twenty-nine days later, the Falajas commenced this appeal and Adebayo moved for a stay of the grant of voluntary departure pending appeal.[8] Our Circuit has determined that we have the power to stay the agency's grant of voluntary departure while we review a removal order, Rife v. Ashcroft, 374 F.3d 606, 615 (8th Cir. 2004), and we exercise that power in this case. The stay of voluntary departure preserves the number of days remaining in the BIA's grant of voluntary departure while judicial review is pending. See Macotaj v. Gonzales, 412 F.3d 704, 707 (6th Cir. 2005); Lopez-Chavez v. Ashcroft, 383 F.3d 650, 654 (7th Cir. 2004); Desta v. Ashcroft, 365 F.3d 741, 747

---

Because the BIA did not address the IJ's extraneous ruling denying discretionary relief, we have no jurisdiction to consider the matter. Ventura, 537 U.S. at 16. We will not remand to the BIA for review of the IJ's refusal to exercise its discretion because we have determined, in any event, that Titilayo is barred by statute from receiving an adjustment of status.

[7]The BIA found that no evidence supported a finding that Adebayo, in contrast to his mother, made misrepresentations of material fact or testified falsely.

[8]Both Titilayo and Adebayo also moved for stay of removal pending appeal, which we granted as unopposed on April 29, 2004.

(9th Cir. 2004).[9]  Accordingly, Adebayo will have one day to depart voluntarily after the issuance of this Court's mandate.[10]

## VI.

In summary, we affirm the BIA's denial of the Falajas' petitions for asylum, withholding of removal, relief under the CAT, and adjustment of status.  We grant Adebayo's motion to stay the BIA's grant of voluntary departure; the remaining period in which he may voluntarily depart the United States shall begin to run when our mandate in this case is issued.

_____

[9]It is unclear from our decision in <u>Rife</u> whether we intended the stay of voluntary departure to reinstate the full thirty-day departure period granted by the BIA or simply the days that remained in the departure period at the time the petition for judicial review was filed.  We now follow our sister circuits in adopting the later approach.

[10]The mandate will issue approximately fifty-two days after the issuance of our decision entering judgment.  <u>See</u> Fed. R. App. P. 40(a)(1); Fed. R. App. P. 41(b).