**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALMAZ SAYOUM ABEBE; SISAY
MENGISTU,
                    *Petitioners,*

            v.

ALBERTO R. GONZALES, Attorney
General,

                    *Respondent.*

No. 02-72390

Agency Nos.
A72-693-580
A72-693-581

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 21, 2005—San Francisco, California

Filed December 30, 2005

Before: Mary M. Schroeder, Chief Judge, Alex Kozinski,
Pamela Ann Rymer, Sidney R. Thomas, William A. Fletcher,
Richard A. Paez, Marsha S. Berzon, Richard C. Tallman,
Richard R. Clifton, Jay S. Bybee, and Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Clifton;
Partial Concurrence and Partial Dissent by Judge Tallman

16859

## COUNSEL

Philip Hornik (argued), Portland, Oregon; Karen Musalo (argued), Stephen Knight, and Tala Hartsough, Center for Gender and Refugee Studies, University of California Hastings College of Law, San Francisco, California, for the petitioners.

Peter D. Keisler, Assistant Attorney General, Donald E. Keener, Deputy Director and Alison R. Drucker, Senior Litigation Counsel (argued), United States Department of Justice, Washington, D.C., for the respondent.

## OPINION

CLIFTON, Circuit Judge:

Mr. Sisay Mengistu and his wife, Ms. Almaz Abebe (together Petitioners), are natives and citizens of Ethiopia who petition for review of a final order of the Board of Immigration Appeals (BIA) denying their application for asylum and withholding of removal. The BIA adopted the decision of the Immigration Judge (IJ), who concluded that Petitioners had not demonstrated a well-founded fear of persecution. Petitioners argued that if the family were returned to Ethiopia, their nine-year-old daughter would be subjected to female genital mutilation (FGM) and Mr. Mengistu would be persecuted because of his political activities. We conclude that the IJ's determination concerning Petitioners' FGM argument is not supported by substantial evidence. FGM constitutes persecution sufficient to support an asylum claim. The record does not support the conclusion reached by the IJ and adopted by the BIA that the risk that Petitioners' daughter will be subjected to FGM is too small to establish a well-founded fear of persecution. Substantial evidence does support the rejection of Petitioners' political persecution argument, however. Based upon the FGM ground, we grant the petition for review and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

On January 1, 1990, Mr. Mengistu came to the United States on a J-1 student visa that required him to return to Ethiopia upon expiration of the visa. Ms. Abebe joined him on February 22, 1993. On July 13, 1993, Petitioners filed an application for asylum.[1] While awaiting resolution of their application, Petitioners had two children, a son, Mikaeh, born

---

[1]Technically, Mr. Mengistu filed the application and listed Ms. Abebe as a derivative applicant.

in 1994, and a daughter, Amen, born in 1996. Both children are U.S. citizens.

Nearly two and a half years after Petitioners filed their request, the asylum office denied their application. The office concluded that Petitioners were aliens who had overstayed their visas and referred them to an IJ for further proceedings. Before the IJ, Petitioners renewed their asylum application, arguing that if their family was required to return to Ethiopia, their daughter, Amen, would be subjected to FGM,[2] and that Mr. Mengistu would be persecuted because of his actual and imputed political activities. The IJ denied Petitioners' application on November 17, 1997.

In a per curiam opinion, the BIA adopted and affirmed the IJ's decision on July 2, 2002. Petitioners petitioned for review of the BIA's decision, and on August 13, 2004, a three-judge panel of this court concluded, with one judge dissenting, that Petitioners did not establish a well-founded fear of persecution based upon either their concern that their daughter would be subjected to FGM or Mr. Mengistu's political activities. On March 3, 2005, we granted Petitioners' request for rehearing en banc, vacating the prior decision of the three-judge panel.

---

[2]FGM has been described by the Sixth Circuit as:

> the collective name given to a series of surgical operations, involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia. Often performed under unsanitary conditions with highly rudimentary instruments, female genital mutilation is extremely painful, permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications, including bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus.

*Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004) (internal quotation marks and citation omitted).

## II. STANDARD OF REVIEW

Keeping in mind that when "the BIA adopt[s] the decision of the IJ, we review the IJ's decision as if it were that of the BIA." *Hoque v. Ashcroft*, 367 F.3d 1190, 1194 (9th Cir. 2004); *see also Tchoukhrova v. Gonzales*, 404 F.3d 1181, 1188 (9th Cir. 2005). We review the IJ's findings of fact for substantial evidence and will uphold these findings if they are supported by " 'reasonable, substantial, and probative evidence on the record considered as a whole.' " *Mejia-Paiz v. INS*, 111 F.3d 720, 722 (9th Cir. 1997) (quoting 8 U.S.C. § 1105a(a)(4)). We review questions of law de novo. *Baballah v. Ashcroft*, 367 F.3d 1067, 1073 (9th Cir. 2004).

## III. DISCUSSION

### A. Female Genital Mutilation Ground

#### 1. Exhaustion

As a preliminary matter, the government argues that we do not have jurisdiction to consider Petitioners' FGM argument because Petitioners did not exhaust this argument before the BIA. In particular, the government contends that Petitioners did not put the BIA on notice that they were appealing the IJ's decision on the FGM ground. As the government points out, Petitioners did not mention the FGM ground in their notice of appeal to the BIA. Furthermore, only one sentence in the brief that Petitioners filed with the BIA referred to this ground. This sentence, which was included in the document's statement of facts, stated: "Further, [Petitioners] submitted written and testimonial evidence regarding their fear that their daughter, Amen Mengistu, born in the United States on May 15, 1996, would be subjected to female genital mutilation if Respondents are forced to return to Ethiopia." No reference was made to Petitioners' concern that their daughter would be subjected to FGM within the argument section of the brief.

Instead, the argument focused solely on the political activities ground.

Making clear that it had reviewed the entire record, however, the BIA did not limit its decision to address only Petitioners' political activities argument for asylum. Instead, the BIA effectively addressed Petitioners' FGM argument and rejected it on substantive grounds. *See Ghassan v. INS*, 972 F.2d 631, 635 (5th Cir. 1992) (noting that the BIA may consider an issue that has not been appealed by either party). In its opinion, the BIA specifically stated that it "adopt[ed] and affirm[ed] the thorough and well-reasoned decision of the Immigration Judge in this case, which correctly found that the [Petitioners] had not adequately demonstrated their eligibility for either asylum or withholding of removal." While the BIA did not provide a more extensive discussion to support its conclusions, the BIA cited its decision in *Matter of Burbano,* 20 I. & N. Dec. 872, 874 (BIA 1994), to signify that it had conducted an independent review of the record and had exercised its own discretion in determining that its conclusions were the same as those articulated by the IJ.

Our caselaw establishes that where the BIA cites its decision in *Burbano* and does not express disagreement with any part of the IJ's decision, the BIA adopts the IJ's decision in its entirety.[3] *See Tchoukhrova*, 404 F.3d at 1188. If the BIA intends to constrict the scope of its opinion to apply to only one ground upon which the IJ's decision rested, the BIA can and should specifically state that it is so limiting its opinion.[4]

---

[3]We have explained that "a *Burbano* affirmance is different from a streamlined affirmance which signifies only 'that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial.' " *Tchoukhrova*, 404 F.3d at 1188 n.3 (quoting 8 C.F.R. § 1003.1(a)(7)(ii)).

[4]That is, for example, what the BIA did in the *Tchoukhrova* case. In its decision in that case, the BIA included a footnote which expressly noted that the Tchoukhrovas "did not contest on appeal the Immigration Judge's

*Compare Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005) (noting that the BIA affirmed on one ground upon which the IJ's decision was based without considering the other issue raised by the petitioner); *see also Singh v. Ashcroft*, 301 F.3d 1109, 1114 (9th Cir. 2002) (same); *Falaja v. Gonzales*, 418 F.3d 889, 897 n.4 (8th Cir. 2005) (same).

On this occasion, the BIA adopted the IJ's decision in full without saying that it limited the scope of its decision to Petitioners' political persecution argument. The IJ's decision discussed both the political persecution ground and the FGM ground and denied both on the merits. We interpret the BIA's express adoption and affirmance of what it described as the "thorough and well-reasoned decision of the Immigration Judge" to mean that it did the same. We take the BIA at its word and do not assume that the Board meant something other than what it said.

**[1]** Recognizing that the BIA elected to consider both of Petitioners' grounds for asylum in this instance, we further note that the BIA could have expressly declined to consider Petitioners' FGM argument based on a finding that the argument was procedurally defective. It did not.[5] The BIA is presumably aware of its ability to decline to review an argument when a petitioner has not properly raised the argument on appeal to the BIA. *See Perez-Rodriguez v. INS*, 3 F.3d 1074, 1080 (7th Cir. 1993) (noting that the BIA declined to consider

---

ruling regarding protection under the Convention Against Torture." *In re Tchoukhrova*, Board of Immigration Appeals, No. A75 772 599 (February 25, 2003) at 1, n.1. By so noting, the Board made clear that it did not pass on that issue and that its adoption of the reasoning of the IJ did not extend to that issue. In contrast, no such limitation was expressed in the BIA's decision in the case at hand.

[5]Petitioners argue that the reference to the FGM ground contained in their brief to the BIA was sufficient to raise the issue. We do not address that argument, because we conclude that the BIA did not reject the FGM argument in this case on the ground that it was not sufficiently raised.

an argument because the petitioner did not raise it on appeal). When the BIA has ignored a procedural defect and elected to consider an issue on its substantive merits, we cannot then decline to consider the issue based upon this procedural defect. *Cf. Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974) (noting that a court can only uphold an agency decision " 'on the same basis articulated in the order by the agency itself,' " quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962)). The BIA's express adoption of the IJ's decision which explicitly discussed the FGM ground is "enough to convince us that the relevant policy concerns underlying the exhaustion requirement — that an administrative agency should have a full opportunity to resolve a controversy or correct its own errors before judicial intervention — have been satisfied here." *Sagermark v. INS*, 767 F.2d 645, 648 (9th Cir. 1985); *see also Socop-Gonzalez v. INS*, 272 F.3d 1176, 1186 (9th Cir. 2001). Thus, we conclude that Petitioners' FGM argument is not barred due to failure to exhaust it before the administrative agency.

### 2.    Substantive Merits of the FGM Argument

**[2]** Eligibility for asylum is established when an alien demonstrates that he is "unable or unwilling to return to the country of origin 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' " *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir. 2003) (quoting 8 U.S.C. § 1101(a)(42)(A)). An alien does not have to prove that it is more likely than not that he will actually be persecuted; even a ten-percent chance of persecution may be sufficient to establish eligibility for asylum based upon a well-founded fear of persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 423, 438, 440 (1987).

**[3]** It is well-settled that FGM constitutes persecution sufficient to warrant a grant of asylum. *See Matter of Kasinga*, 21

I. & N. Dec. 357, 365 (BIA 1996); *Mohammed v. Gonzales*, 400 F.3d 785, 795-96 (9th Cir. 2005); *Toure v. Ashcroft*, 400 F.3d 44, 49 n.4 (1st Cir. 2005); *Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004); *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004); *Abankwah v. INS*, 185 F.3d 18, 23 (2d Cir. 1999). The government has not argued otherwise.

[4] It is uncertain whether the IJ used the correct standard in evaluating Petitioners' FGM argument. In explaining the standard used to determine whether a well-founded fear of persecution exists, the IJ stated in his oral decision that "[a] reasonable person may well fear persecution even where the likelihood is significantly less than clearly probable, however, there must be a reasonable possibility of actually suffering such persecution." The IJ then concluded that FGM "is not likely to be a threat" to Amen if her family is returned to Ethiopia. The proper standard, however, is not whether the persecution feared is "likely to be a threat." Instead, as noted above, the Supreme Court held in *Cardoza-Fonseca* that even an alien who can demonstrate only a ten percent chance of future persecution may prevail in a claim for asylum. Whether that is what the IJ meant by "a reasonable possibility" was not made clear.

[5] Substantial evidence in the record does not, in any event, support a finding that there was less than a ten percent chance that Amen would be subjected to FGM in Ethiopia. In his ruling, the IJ mischaracterized Petitioners' testimony on this subject. The IJ noted that

> [Mr. Mengistu] . . . testified that he has no family other than his elderly parents and his siblings and the State Department material does indicate and the Court does not believe that FGM would be forced upon his daughter without his and his wife's consent. [Mr. Mengistu's] testimony that his wife would not be able to prevent such actions by her relatives was contradicted by [Ms. Abebe's] testimony. She testi-

fied that she would be able to prevent it but that her family would probably reject her if she did prevent it.

Contrary to the IJ's findings, however, neither Mr. Mengistu nor Ms. Abebe actually testified that they would be able to prevent Amen from being subjected to FGM.

Mr. Mengistu testified that FGM is a ritual that "almost practically all females have to undergo" in Ethiopia. He explained that while he and his wife both oppose the practice, "[i]t's not as easy as that. I mean there will be pressure from the society, from the grandparents. I mean it's everybody is [sic] forced to go through that . . . ." He further clarified that while he would try to prevent Amen from being subjected to the ritual, if he were imprisoned or otherwise separated from his family after their return to Ethiopia, Ms. Abebe would be unable to prevent Amen from being subjected to FGM.

Ms. Abebe testified that FGM was performed on her when she was a child. She explained that she does not believe in FGM and does not want her daughter to be subjected to the procedure. She stated, however, that she would be rejected by her family, her husband's family, and her society if she opposed the ritual.

[6] Documentary evidence in the record supported Petitioners' contention that they had an objectively reasonable fear that Amen would be subjected to FGM if the family were returned to Ethiopia. One report indicated that as of 1993, 90% of women in Ethiopia were subjected to FGM.[6] Another

---

[6]In reviewing an IJ's determination, we look to the facts and evidence in the record at the time of the original decision. *See Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996). We are mindful, however, that in asylum cases, circumstances sometimes change in the countries at issue during the course of the litigation. In this instance, though, the practice of FGM appears to be have remained prevalent in Ethiopia. *See* the State Depart-

report substantiated Petitioners' argument that the ethnic group to which their families belong, the Amharas, regularly practiced FGM. The State Department's Ethiopia Country Report on Human Rights Practices for 1996, at 17, stated that "[a]lmost all girls [in Ethiopia] undergo some form of female genital mutilation . . . . Clitorectomies are typically performed 7 days after birth, and the excision of the labia and infibulation, the most extreme and dangerous form of FGM, can occur any time between the age of 8 and the onset of puberty."

The State Department Report for 1994, at 5, indicated that "[m]ost Ethiopian females have undergone some form of genital mutilation." This report also advised that "the practice varies widely and in degree depending on ethnicity and urban/rural status . . . . Most urban women under the age of 25 are unlikely to be mutilated. Reportedly, women are able to prevent their daughters from being subjected to circumsion [sic] by relatives." These statements alone, however, should not have been sufficient to persuade a reasonable factfinder that there was less than a ten percent chance that Amen would be forcibly subjected to FGM if the family were returned to Ethiopia.

**[7]** Instead, the evidence indicated that the probability that Amen would have to undergo this ritual greatly exceeded the threshold required to establish eligibility for asylum. Thus, since the IJ's conclusion regarding Petitioners' FGM argument was not based on substantial evidence, we vacate this portion of the IJ's decision. *See Knezevic v. Ashcroft*, 367 F.3d 1206, 1215 (9th Cir. 2004) (remanding to the BIA

ment's Ethiopia: County Reports on Human Rights Practices — 2004, *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41603.htm (last visited December 6, 2005) (noting that a government survey released in 2003 indicates that "90 percent of women undergo one of four forms of FGM circumcision, clitoridectomy, excision, and infibulation").

because the denial of asylum was not based on substantial evidence).

**[8]** We do not reach the issue of whether Petitioners, parents of a U.S. citizen child likely to face persecution in her parents' native country, may derivatively qualify for asylum. That was not a ground relied upon or even discussed by the IJ or the BIA in this case. We remand to give the BIA the opportunity to address the matter in the first instance, as the Supreme Court has instructed. *Ventura v. INS*, 537 U.S. 12, 17 (2002).[7]

## B.   Political Persecution Argument

Petitioners also argued before the IJ that they had a well-founded fear that Mr. Mengistu would be persecuted based upon his actual and imputed political activities if the family were returned to Ethiopia. After considering Petitioners' testimony and the documentary evidence in the record, the IJ determined that Petitioners had not demonstrated eligibility for asylum on this basis. The IJ's conclusion regarding Petitioners' political persecution argument was supported by substantial evidence.

To put Petitioners' political persecution argument into context, some background regarding Ethiopia's recent political history is necessary. From 1974 to 1991, Ethiopia was ruled by a dictatorial Marxist regime, known as the Derg, which was dominated by members of the Amhara ethnic group, to which Petitioners belong. In 1991, the Derg regime was overthrown by the Ethiopian People's Revolutionary Democratic Front (EPRDF), a coalition of political parties predominately

---

[7]The dissenting opinion describes this result as treading "boldly." Dissent at 16884. But remanding all other issues to the BIA is exactly what the government has urged us to do at this point. It is the dissent which proposes to consider grounds not relied upon by the BIA or argued by the government in order to deny the petition.

controlled by the Tigrean ethnic group. Since the overthrow of the Derg, Amharas have experienced open hostility and harassment from other ethnic groups.

In claiming that Mr. Mengistu would be persecuted by the EPRDF, Petitioners essentially offered three arguments. First, Petitioners asserted that it was likely that the EPRDF would assume that Mr. Mengistu was a supporter of the former Derg regime because he is Amhara and his parents were Derg supporters. Petitioners point out that after the Derg regime was overthrown, Mr. Mengistu's parents were imprisoned for two weeks and were denied their civil rights, including the right to vote.

There is no evidence, however, concerning the location or conditions of his parents' detention. Nor is there any evidence that the EPRDF would treat Mr. Mengistu, who was not himself a Derg supporter, more harshly than it treated his parents, who were active Derg supporters. The IJ concluded that the fact that his parents were only detained for two weeks suggested that Mr. Mengistu, whose only connection to the Derg organization was through his parents, would not be treated any more harshly and would therefore not be persecuted. The BIA adopted that reasoning, and we cannot say that the record compels a contrary finding. Furthermore, Mr. Mengistu has four siblings and seven half-siblings, and with the exception of one sister, who was an active Derg supporter, his siblings have remained in Ethiopia largely without incident.

Second, Petitioners argued that it was possible that the government would assume that Mr. Mengistu was a Derg supporter because he received a scholarship to study abroad while the Derg regime was in power. The record indicates, however, that after the EPRDF came to power, Mr. Mengistu's passport was renewed so that he could remain abroad and continue to take advantage of the scholarship. There was no evidence that the new government wanted to prevent him from returning home, or that it was persecuting persons sim-

ply because they were returning from education paid for by scholarships awarded under the Derg regime.

Finally, Petitioners argued that the EPRDF would persecute Mr. Mengistu because in 1993 Mr. Mengistu joined Medhin, a political organization that opposes the EPRDF. Some of Medhin's members viewed violence as an acceptable means to overthrow the EPRDF, but Mr. Mengistu testified that he did not believe in using violence to achieve the organization's goals. As a Medhin member, Mr. Mengistu has attended meetings, helped recruit members, and attended a Medhin conference in Washington, D.C.

[9] The fact that Petitioner is a member of Medhin, however, does not in and of itself demonstrate that he has a well-founded fear of persecution. Evidence in the record indicates that the EPRDF has not ordinarily targeted individuals who renounce violence. Also, as the IJ recognized, Mr. Mengistu's association with Medhin was limited, and Mr. Mengistu did not receive any threats arising from his membership in Medhin. *See Singh v. INS*, 134 F.3d 962, 968 (9th Cir. 1998) (explaining that when there is no evidence of significant physical violence or specific threats of serious harm, we are unlikely to find persecution). Thus, we conclude that substantial evidence supports the IJ's determination that Petitioners failed to demonstrate that they have a well-founded fear that Mr. Mengistu would be persecuted because of his actual or imputed political activities.

## IV.  CONCLUSION

While substantial evidence supports the IJ's determination concerning Petitioners' political persecution argument, the IJ erred in concluding that Petitioners failed to demonstrate a well-founded fear that their daughter will be subjected to FGM if the family is returned to Ethiopia. Consequently, we grant the petition, vacate the order of removal, and remand for further proceedings consistent with this opinion.

**PETITION FOR REVIEW GRANTED; REMANDED WITH INSTRUCTIONS**.

---

TALLMAN, Circuit Judge, with whom Judges KOZINSKI, RYMER, BYBEE, and CALLAHAN join, dissenting in part and concurring in part:

I

I respectfully dissent. The Petitioners failed to adequately raise the Female Genital Mutilation (FGM) issue in their appeal to the Board of Immigration Appeals (BIA). It remains administratively unexhausted and I would dismiss the petition for lack of subject matter jurisdiction. *See* 8 U.S.C. § 1252(d)(1); *Zara v. Ashcroft*, 383 F.3d 927, 930 (9th Cir. 2004) (holding that the "[f]ailure to raise an issue in an appeal to the BIA constitutes a failure to exhaust remedies with respect to that question and deprives this court of jurisdiction to hear the matter" (alteration in original) (quoting *Vargas v. United States Dep't of Imm. & Nat.*, 831 F.2d 906, 907-08 (9th Cir. 1987))). By neglecting to raise the FGM issue in their counseled Notice of Appeal, or to challenge the decision of the Immigration Judge (IJ) within their counseled brief to the BIA, the Petitioners did not put the BIA on notice of their claim or give the agency "a full opportunity to resolve [the] controversy or correct its own errors before judicial intervention." *Ladha v. INS*, 215 F.3d 889, 903 (9th Cir. 2000) (alteration in original) (quoting *Sagermark v. INS*, 767 F.2d 645, 648 (9th Cir. 1985)).

The Petitioners referred only to the IJ's decision denying asylum on grounds of political persecution in their Notice of Appeal to the BIA. Specifically, the Petitioners argued that the IJ's decision was in error because "[t]hrough their testimony and written evidence, [Petitioners] met their burden of proving that Mr. Mengistu had a well-founded fear of perse-

cution due to his actual and imputed political opinion." They made no mention of FGM, their daughter's fear of FGM, or the likelihood that their daughter would be ostracized for not undergoing FGM. Nor did the Petitioners alert the BIA to the fact that they sought derivative asylum through their daughter, who allegedly fears persecution if forced to travel to her parents' homeland. The Petitioners have no direct claim to asylum based on FGM. Since "[n]otices of appeal are filed directly with the BIA, and the regulations specifically contemplate that supporting briefs are not required to be filed by a party . . . , the notice of appeal is of great importance in raising claims before the BIA." *Ladha,* 215 F.3d at 903 (internal citations omitted).

A party who fails to raise an issue in the Notice of Appeal may still exhaust his administrative remedies by adequately addressing the issue within his brief to the BIA. *Zhang v. Ashcroft*, 388 F.3d 713, 721 (9th Cir. 2004) (per curiam) (holding that petitioner had exhausted his claim by "explicitly mention[ing] in his brief to the BIA that he was requesting reversal of the IJ's denial of relief under the Convention Against Torture"); *see also Ladha*, 215 F.3d at 901 n.13 (finding exhaustion when the IJ considered and rejected a claim and the party challenged "this very aspect of the IJ's opinion" within its brief before the BIA). The Petitioners failed to meet this standard as well. The Notice of Appeal says nothing about FGM. The only reference to FGM in the brief to the BIA is a general, one-sentence proclamation buried within the fact section.[1] This summary statement served only as a side

---

[1]Although the majority quotes that statement verbatim, *see* maj. op. 16865, I find it necessary to produce it again here in order to demonstrate the matter-of-fact approach taken by the Petitioners. Had they truly pursued this issue on appeal, they surely would have discussed the statistics and/or reports upon which the majority now relies. Instead, the only reference to FGM in the thirteen-page brief is the following: "Further, [Petitioners] submitted written and testimonial evidence regarding their fear that their daughter, Amen Mengistu, born in the United States on May 15,

note; it did not provide notice to the BIA that the Petitioners sought to challenge the IJ's decision with regard to the possibility of FGM being forced by Ethiopian culture upon the Petitioners' American-born daughter. *See Zara*, 383 F.3d at 930 (dismissing the petition for lack of subject matter jurisdiction because a general challenge to the IJ's decision is insufficient to satisfy the exhaustion requirement).

The absence of notice is further evidenced by the concluding remarks in their BIA brief where, again with the assistance of their lawyer, they addressed only the IJ's decision on political asylum:

> Mr. Mengistu's actual political beliefs and activities, as well as those that will be imputed to him because of his DERG-funded education abroad and his parents' political activities on behalf of the DERG, give rise to a well[-]founded fear of persecution if he returns to Ethiopia. By the same token, these factors establish a clear probability of persecution if he returns to Ethiopia.

> Therefore, the Immigration Judge's decision denying Respondents' applications for asylum and withholding was erroneous and should be reversed.

Clearly, Petitioners sought review only of the IJ's asylum decision as it pertained to the father on political persecution grounds. They raised no substantive argument as to the possibility of persecution of their daughter because of FGM, or their entitlement to derivative asylum as a result of this possi-

_____

1996, would be subjected to female genital mutilation if [they] are forced to return to Ethiopia." By stating at page 16872 of the majority opinion "[t]hat [this] was not a ground relied upon or even discussed by the IJ or the BIA in this case," the majority concedes that the issue was not exhausted below. We have no jurisdiction to consider the issue or even to remand it back to the agency.

bility, and, consequently, the BIA did not have an opportunity to resolve the controversy or correct its own alleged errors. We cannot intervene in the administrative process if the BIA was not first given such an opportunity; therefore, we do not have jurisdiction over the FGM claim.

The BIA's issuance of a *Burbano* affirmance does not change this analysis or the necessary result. A *Burbano* affirmance signals only that the BIA has adopted the IJ's decision as it pertains to those issues adequately raised on appeal; it does not equate to a blanket acceptance of the IJ's entire decision when only parts of that decision are appealed. *See Mabugat v. INS*, 937 F.2d 426, 430 & n.2 (9th Cir. 1991) (reviewing the IJ's decision because the "[BIA] appear[ed] to have adopted (or at least relied upon) the immigration judge's findings and conclusions to make its decision" but dismissing the arguments that the petitioner failed to raise before the BIA). In contrast, the majority opinion unjustifiably expands the scope of a *Burbano* affirmance beyond the issues actually raised on appeal to all issues decided by the IJ. The result can only be to encourage shifting theories on appeal when previously (and properly) presented issues are rejected. We have an entire body of immigration jurisprudence that requires issues to be fully and squarely presented below. *See Zara*, 383 F.3d at 930; *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004); *Cortez-Acosta v. INS*, 234 F.3d 476, 480 (9th Cir. 2000) (per curiam); *Mabugat,* 937 F.2d at 430; *Vargas*, 831 F.2d at 907-08.

In *Matter of Burbano*, the BIA emphasized that when reviewing the "discretionary determination by an immigration judge, [it] rel[ies] upon [its] own independent judgment in deciding the ultimate disposition of the case." 20 I. & N. Dec. 872, 873 (BIA 1994). However, this independent review "does not preclude the [BIA] from adopting or affirming a decision of the immigration judge, *in whole or in part*, when [it is] in agreement with the reasoning and result of that decision." *Id.* at 874 (emphasis added). Therefore, depending

upon the issues raised on appeal, the BIA may agree with the IJ's decision in its entirety, or it may agree with the IJ's decision only as to the issues relevant to deciding the appeal.

The flaw in the majority's decision can be illustrated by the very case on which it relies, *Tchoukhrova v. Gonzales*, 404 F.3d 1181 (9th Cir. 2005). In *Tchoukhrova,* the IJ determined that the petitioners had failed to establish past persecution or a well-founded fear of future persecution and, therefore, denied both the application for asylum and the claim for relief under the Convention Against Torture. *Id.* at 1187. On appeal, the petitioners pursued only their asylum claim, and abandoned their Convention Against Torture claim. *Id.* at 1187 n.2. The BIA upheld the IJ's decision through a *Burbano* affirmance. The *Tchoukhrova* court explained that it was going to review the IJ's decision as if it were that of the BIA. *Id.* at 1188. The court reasoned that "[w]hen the BIA does not express any disagreement with any part of the immigration judge's decision, but instead cites *Burbano*, the BIA adopts his decision in its entirety." *Id.* If this were true, the BIA not only adopted the IJ's decision on asylum, but also his decision on the Convention Against Torture claim. This conclusion is unjustified given the BIA's express acknowledgment that the Tchoukhrovs had abandoned the claim on appeal. In any event, because we are sitting en banc, we are not bound by *Tchoukhrova*, and I would overrule *Tchoukhrova* on this point.

The burden is not on the BIA to expressly delineate what is and what is not being considered on appeal; rather, the burden is on the petitioner to "specify which issues form the basis of the appeal." *Zara*, 383 F.3d at 930; *see, e.g., Cortez-Acosta*, 234 F.3d at 480 (dismissing petitioner's arguments regarding domicile and due process because he had failed to address those issues in his appeal to the BIA). Then, when deciding those issues pursued on appeal, if the BIA does not agree fully with the IJ's decision as to those particular issues, the "BIA can and should specifically state that it is so limiting

its opinion." Maj. op. at 16866. However, the BIA is not required to specify whether it agrees with irrelevant parts of the IJ's reasoning.

In this case, the only issue pressed on appeal was a challenge to the IJ's decision to deny asylum to the father based on political persecution. Given that the derivative FGM claim was not preserved on appeal, the BIA's issuance of a *Burbano* affirmance does not signify its agreement with the IJ's decision on that issue. The BIA was never asked to review it. Consequently, we must dismiss this newly minted appellate issue for lack of subject matter jurisdiction.[2]

## II

Even if we had jurisdiction to reach the merits, there is a fatal flaw in the majority's analysis. The majority says that it is "not reach[ing] the issue of whether Petitioners, parents of a U.S. citizen child likely to face persecution in her parents' native country, may derivatively qualify for asylum." Maj. op. at 16872. However, by sleight of hand in remanding the entire petition back to the BIA, the majority implicitly assumes that parents of a United States citizen child are nonetheless entitled to claim derivative asylum relief based on the possibility that their citizen child would be subjected to FGM. In so assuming, the majority's remand is illusory. Although the practice of FGM is considered persecution under our law, there is no threat here since a United States citizen child cannot be deported to the country of her parents' birth, and the parents cannot claim an unrecognized form of derivative relief when they themselves cannot establish entitlement to asylum. By usurping the prerogative of Congress, which alone has the power to create a new basis for cancellation of removal, the majority violates the separation of powers doctrine and creates an unnecessary conflict with the Seventh Circuit. *See*

---

[2]I agree there was no sufficient showing on the political persecution claim.

*Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003) (holding that an alien parent "may not establish a derivative claim for asylum by pointing to potential hardship to the alien's United States citizen child in the event of the alien's deportation").

Like the petitioner in *Oforji*, Mr. and Mrs. Mengistu are seeking derivative entitlement to asylum through their daughter. *See id.* at 615 (stating that Oforji requested the Seventh Circuit to extend derivative asylum to her based on the fear that her daughter, a United States citizen, would be subjected to FGM). The *Oforji* court noted that there is no authority for granting such a derivative asylum claim. The statutory and regulatory provisions governing asylum make it applicant specific. *See* 8 U.S.C. § 1101(a)(42)(A) (defining a refugee to be a person unwilling or unable to return to his or her native country because of persecution or a well-founded fear of future persecution); 8 C.F.R. § 1208.13(b) ("The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution."); *id.* § 1208.13(b)(1) (creating a rebuttable presumption of a well-founded fear of future persecution if "the applicant can establish that he or she has suffered persecution in the past"); *id.* § 1208.13(b)(1)(i)(A) (stating that the government can overcome that presumption if it establishes "that the applicant no longer has a well-founded fear of persecution"); *id.* § 1208.13(b)(2)(i)(A)-(C) (defining a "well-founded fear of persecution" in terms of fear of the applicant); *id.* § 1208.13(b)(2)(ii) (limiting eligibility if "the applicant c[an] avoid persecution by relocating to another part of the applicant's country").

Moreover, the concept of "constructive deportation" should not apply here because the Petitioners' daughter, a United States citizen, has a legal right to remain in this country. As the Seventh Circuit recognized in *Oforji*, deportation when minor aliens are involved raises a separate issue. Because a minor alien has no legal right to remain in the United States, "deportation of [her] parents would result in [her] being 'con-

structively deported.' " *Oforji*, 354 F.3d at 616 (quoting *Salameda v. INS*, 70 F.3d 447, 451 (7th Cir. 1995)). Thus, when addressing the parents' application for asylum, it is proper to consider not only the potential persecution the child may face, but also any hardship to the alien child due to the deportation of her parents. *Id.* (reasoning that because the minor alien is not the target of deportation, any hardship that the minor alien may face must be considered in the application of the parents). In this case, there is no threat of "constructive deportation." Because the Petitioners' daughter *has* a legal right to remain in the United States as an American-born United States citizen, Congress has provided no statutory exception to consider the hardship she may face due to the deportation of her alien parents.

### III

Congress has considered similar situations, and while it has chosen to grant relief in some circumstances, those provisions do not apply in this case. Since the Petitioners' deportation proceedings began on January 10, 1996, they are governed by pre-IIRIRA[3] law. *See Romero-Torres v. Ashcroft*, 327 F.3d 887, 888 n.3 (9th Cir. 2003). Under the pre-IIRIRA rules regarding the suspension of deportation, the Attorney General may cancel deportation of a deportable alien who meets all of the following criteria:

> [1]   has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application;
> . . .
>
> [2]   proves that during all of such period he was and is a person of good moral character; and

---

[3]Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009.

[3] is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

Immigration and Nationality Act, § 244(a)(1), 8 U.S.C. § 1254(a)(1) (repealed 1996).

Congress recognized that there may be situations where the deportation of a parent may cause undue hardship to family members who are able to remain in the United States due to their citizenship. However, when it crafted its limited relief, Congress sought to keep separate a citizen child's right to stay in the United States from the alien mother's obligation to depart. *Oforji*, 354 F.3d at 618. Congress did not want to create an incentive for an otherwise deportable alien to bear a child who would automatically become a citizen. *Id.* This policy decision is illustrated by the time requirements Congress built into the statute. "[T]he continuous presence requirement for suspension of deportation . . . demonstrates that Congress considered the possibility of hardships to the family members of aliens not meeting the requirements for suspension of deportation, but limited the possibility of suspension to those who remained in the United States continuously for [seven] years." *Id.* at 617. At the time their deportation proceedings commenced, the Petitioners had not satisfied the continuous presence requirement. Consequently, they may not claim an unrecognized exception to deportation under this statute. Our Court has no legislative power to create a new exception, much less impose such a new exception on the BIA by remanding the application for asylum. Doing so implicitly gives judicial imprimatur to the legitimacy of a parental derivative asylum claim.

The Petitioners claim that they have a well-founded fear of persecution because their daughter likely would be subjected to FGM should they be forced to return to Ethiopia. In the

alternative, they claim that even if they are able to protect their daughter from FGM, she would still face persecution because she would be ostracized by their family and the rest of society. For the reasons discussed above, under current United States immigration law, their claims must fail. The Petitioners do not personally fear FGM and there is no authority within the statutes or the regulations permitting the Attorney General to exercise any discretion to grant derivative asylum to alien parents based on the persecution of the Petitioners' child, who is a United States citizen.

IV

If we reach the merits by ignoring the procedural jurisdictional default, the petition must still be denied. Because the Petitioners cannot meet the eligibility criteria clearly delineated by Congress for asylum or the remedy of cancellation of removal, remand is not appropriate. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *see also He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003) (declining to issue a remand when the applicant was automatically eligible for asylum and statutory interpretation was unnecessary). Because the law does not permit us to go where the majority so boldly wishes to tread, I respectfully dissent.